# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-IA-01099-SCT

*EDWARD A. WILLIAMSON, INDIVIDUALLY, AND*
*EDWARD A. WILLIAMSON, P. A.*
*v.*

*LISA EDMONDS AND LARRY EDMONDS*

| | |
|---|---|
| DATE OF JUDGMENT: | 4/10/2003 |
| TRIAL JUDGE: | HON. LARRY EUGENE ROBERTS |
| COURT FROM WHICH APPEALED: | KEMPER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN BENTON CLARK |
| | SIMINE BAZYARI REED |
| | ERNEST G. TAYLOR |
| | SHANDA L. LEWIS |
| ATTORNEY FOR APPELLEES: | GEORGE W. HEALY, IV |
| NATURE OF THE CASE: | CIVIL - LEGAL MALPRACTICE |
| DISPOSITION: | AFFIRMED AND REMANDED - 08/12/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

### Procedural History

¶1.    Lisa and Larry Edmonds (the Edmondses) sought a declaratory judgment in the Circuit Court of Kemper County, Mississippi, against attorney Edward A. Williamson and his law firm, Edward A. Williamson, P.A. (hereinafter Williamson), alleging Williamson breached his duty of care, contractual obligations, and duty of loyalty to his clients.  Subsequently, the Edmondses filed an amended complaint against Williamson demanding a total of $1,000,000 in damages, attorney fees and other relief.

¶2.     The Edmondses served discovery requests on Williamson. Williamson responded by arguing that much of the information was privileged or otherwise confidential pursuant to the confidentially agreement contained in the settlement. Williamson settled the Edmondses' claims along with other named and unnamed plaintiffs in connection with *Annette Williams, et al. v. American Home Products Corp.*, Cause No. 2000-207, pursuant to the Qualified Settlement Fund (QSF) order entered in the Circuit Court of Holmes County, Mississippi, in compliance with the regulations established by the Internal Revenue Service.

¶3.     Williamson objected to answering the Edmondses' propounded interrogatories and requests for documents maintaining that they violated attorney-client privilege and the confidentiality agreement contained within the settlement relating to Williamson's representation of other Phen-Fen clients included in the settlement, including the names of all of Williamson's Phen-Fen clients, the total settlement amount, and the amount of all individual settlements. Williamson argued that disclosure would violate the contractual confidentiality of the settlement and the QSF order.

¶4.     The QSF order entered by the Holmes County Circuit Court contained the following provisions:

5.      Upon delivery of the consideration to be paid by the defendant and delivery of the signed Confidential Releases by all plaintiffs and claimants, the liability of the defendant, American Home Products Corporation, shall be extinguished.

6.      All parties to this settlement and their lawyers and representatives and the Administrator; shall keep the terms of this settlement confidential and the proceedings herein sealed.

The Edmondses filed their motions to compel answers to the propounded interrogatories and requests for production of documents. Williamson responded again asserting attorney-client privileges on behalf of his other clients involved in the settlement and arguing that the confidentiality agreement incorporated into the QSF order issued by the Circuit Court of Holmes County barred disclosure.

¶5.     Williamson also filed a motion for protective order to prohibit the Edmondses from seeking discovery of confidential settlement documents and information attaching the Holmes County Circuit Court QSF order.   Williamson later filed a supplemental motion for protective order seeking also to prevent the taking of the deposition of, and the production of subpoenaed documents by, Dr. Malcolm Taylor, a medical expert in the Holmes County Circuit Court litigation against American Home Products Corporation (hereinafter American Home).

¶6.     Several former plaintiffs in the Holmes County Circuit Court litigation represented at this time  by counsel other than Williamson intervened for the limited purpose of asserting their claims of legal and medical privileges.

¶7.     Williamson filed a motion to dismiss or transfer the case to Holmes County Circuit Court. Following a hearing held regarding venue and discovery issues, the Kemper County Circuit Court issued its Memorandum Opinion and Order denying Williamson's motion to dismiss or transfer to Holmes County, granting Edmondses' motion to compel as to attorney-client and physician-patient privileges, and ordering the parties to seek relief from the Holmes County Circuit Court from the confidentiality provision of the QSF Order.  Williamson moved to reconsider or in the alternative, to certify the issues for interlocutory appeal.  In turn, we granted permission for this interlocutory appeal. *See* M.R.A.P. 5.

## Facts

¶8.     Williamson represented 31 clients and their spouses in Phen-Fen product liability litigation against American Home.  The Edmondses were among Williamson's clients.  On November 12, 2000, Lisa first met with Williamson at his law office in Philadelphia, Neshoba County, Mississippi.  Five days later, Lisa returned to Williamson's law office in Philadelphia to sign a contract of representation.  Williamson filed suit on behalf of 14 named plaintiffs out of the 31 clients in ***Annette Williams, et al. v. American Home***

3

*Products Corp.* in the Circuit Court of Holmes County. The Edmondses were not named as plaintiffs. Williamson prosecuted the claims of all 31 clients, whether named or unnamed in the litigation.

¶9. On April 24, 2001, Williamson negotiated an aggregate settlement on behalf of the 31 clients and their spouses in *Annette Williams, et al v. American Home Products Corp.* in the Circuit Court of Holmes County. In the QSF order, the Holmes County Circuit Court approved the settlement as negotiated by Williamson. Additionally, the trial court sealed the terms of the settlement. Each client executed a release and confidentiality agreement in exchange for a monetary settlement. Lisa executed her settlement documents at Williamson's law office in Philadelphia, Mississippi. Subsequent to Lisa's executing the settlement documents, her husband, Larry, settled his loss of consortium case. Larry executed the settlement documents at Williamson's law office in Philadelphia.

¶10. The Edmondses lived in Kemper County, Mississippi. During the course of his representation, Williamson's law office mailed documents to Lisa at her Kemper County residence, via US Mail, and hand-delivered one letter to Lisa at her home by Williamson's legal assistant.

¶11. On interlocutory appeal, Williamson raises the issue of whether the trial court erred in not transferring venue from Kemper County. Williamson also raises the issue of attorney-client privilege and doctor-patient privilege for the medical information and the confidentiality agreement contained in the QSF order entered by the Holmes County Circuit Court. Williamson argues that each of these prevent the disclosure of the information requested by the Edmondses.

## Legal Analysis

**I.    Whether the Trial Court Erred in Denying the Defendants' Motion to Transfer Venue?**

¶12. The Edmondses filed their complaint in this action on July 15, 2002. Thus, the amendments to the venue statute which went into effect on January 1, 2003, are not applicable to the case sub judice as per Section 16 of 2002 Miss. Laws, 3d Ex. Sess., ch. 4, which states: "This act shall take effect and be in force from and after January 1, 2003, and shall apply to all causes of action filed on or after that date." The applicable venue statute, prior to that amendment, read in pertinent part:

> Civil actions of which the circuit court has original jurisdiction shall be commenced in the county in which the defendant or any of them may be found or in the county where the cause of action *may occur or accrue* and, if the defendant is a domestic corporation, in the county in which said corporation is domiciled or in the county where the cause of action may occur or accrue, except where otherwise provided . . . .

Miss. Code Ann. § 11-11-3 (1) (Supp. 2001) (emphasis added). As amended, the section omits the accrual language.

¶13. An application for a change of venue is addressed to the discretion of the trial judge, and his ruling thereon will not be disturbed unless it clearly appears that there has been an abuse of discretion or that the discretion has not been justly and properly exercised under the circumstances of the case. *Beech v. Leaf River Forrest Prods., Inc.*, 691 So.2d 446, 448 (Miss. 1997) (quoting *Miss. State Highway Comm'n v. Rogers*, 240 Miss. 529, 128 So.2d 353, 358 (1961). Additionally, the trial court must give the plaintiff the benefit of reasonable doubt with respect to venue selection, and this Court must do the same on appeal. *Pisharodi v. Golden Triangle Reg'l Med. Ctr.*, 735 So.2d 353, 354 (Miss. 1999). It is well-established that the plaintiff is entitled to choose between any of the permissible venue options where credible evidence or factual basis supports the venue selected. *See Wal-Mart Stores, Inc. v. Johnson*, 807 So.2d 382, 387 (Miss. 2001); *Earwood v. Reaves*, 798 So.2d 508,513 (Miss. 2001); *Forrest County Gen. Hosp. v. Conway*, 700 So.2d 324, 325 (Miss. 1997). A substantial component of the claim must have taken place in the county for venue to exist where the alleged act or omission occurred.

5

*See Flight Line, Inc. v. Tanksley*, 608 So.2d 1149, 1157 (Miss. 1992). *See also Earwood*, 798 So.2d at 513 (holding that Covington County, where receipt of the check for an allegedly insufficient amount occurred, would be a substantial component of the claim); *Conway*, 700 So.2d at 325.

¶14.    In *Tanksley*, an airplane was improperly loaded in Warren County, Mississippi. *Tanksley*, 608 So.2d at 1153-54.  The plane flew to Chicago, Illinois, where Tanksley was injured while unloading the plane. *Id*.  Tanksley's injury was the result of the improper loading. *Id*.  This Court found venue to be proper in Warren County finding that the injury could not have occurred without the negligent loading. *Id* at 1156-57.  We stated:

> In the final analysis, venue is about convenience. The legislative prescription implies a legislative finding counties meeting certain criteria will generally be more convenient to the parties. The use of "occur" makes sense because important witnesses will often be accessible where the action occurs. Yet, there is nothing in the phrase "where the cause of action may occur . . ." that limits the judicial search for but a single county. Torts arise from breaches of duties causing injuries, and it is common experience that breach and causation and impact do not all always happen at once.  At the very least, the word "occur" connotes each county in which a *substantial component* of the claim takes place, and this may include, in the present context, the negligent conduct which substantially undergirds Tanksley's claim.

*Tanksley*, 608 So.2d at 1157. *See also Earwood*, 798 So.2d at 513 (quoting *Tanksley*, 608 So.2d at 1157).

¶15.    As correctly stated by the trial court, Miss. Code Ann. § 11-11-3 (Supp. 2001), the governing Mississippi venue statute, as it existed when the suit was filed is applicable in this case.  For venue purposes, a cause of action accrues "either where the actual tortious conduct occurs or where the plaintiff suffers actual injuries from the negligence." *Wal-Mart Stores, Inc. v. Johnson*, 807 So.2d 382, 387

(Miss. 2001). This Court defined and distinguished the "occur" and "accrue" language found in *Flight Line, Inc. v. Tanksley*, 608 So.2d 1149, 1156 (Miss. 1992), by stating:

> 'Occur' and 'accrue' are not synonymous, legally or otherwise, as the disjunctive connector forthrightly suggests. We read accrual in its formalistic sense. A cause of action accrues when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested ... this may well mean the moment injury is inflicted, that point in space and time when the last legally significant fact is found...

¶16.     Here, the trial court found that the "correspondences, documents, phone calls, and personal contact between plaintiffs, defendants, and defendants' employees all occurred in Kemper County during the course of the representation." Although Holmes and Neshoba Counties are also proper venues for this action, the plaintiff is afforded the right to choose among permissible venues and this "choice must be sustained unless in the end there is no credible evidence supporting the factual basis for the claim of venue." *Tanksley*, 608 So.2d at 1155.

¶17.     To support their claim for breach of contract and breach of the duties of loyalty and care, the Edmondses rely upon conversations and correspondence carried out or received in Kemper County, their county of residence. Although Williamson now claims "only a few documents were mailed and one was delivered to the Edmondses in Kemper County," Williamson admitted "there was a lot of things sent to Ms. Edmonds in Kemper County" and "everything that was of interest in the case" was sent to Ms. Edmonds in Kemper County. The information sent to Kemper County is central to the Edmondses' allegations of breach of the duties of loyalty and care by their attorney. Williamson further admits that when the Edmondses failed to sign the release to settle the claims in his Neshoba County office, his assistant Glinda Bowles, more commonly known as "Kookie," was sent to hand-deliver the release the very next day. The Edmondses refused to sign the release because Williamson only showed Lisa the release and structured

7

settlement and he settled for less than the amount previously discussed and agreed upon. The Edmondses allege Williamson threatened to drop Lisa's case and proceed with "his attorney lien on any lawsuit in the future," telling Lisa she "wouldn't be able to find another attorney" to take her case. In addition to delivering the release to the Edmondses in Kemper County, the Edmondses allege that after their conversation with Kookie, combined with discussions and correspondences had directly with Williamson, they decided to sign the agreement and did so at the Williamson office in Neshoba County soon after Kookie's visit. Williamson also admitted that Kookie was responsible for certain aspects of his operation and described "Kookie's relationship as more of the contact person."

¶18. The Edmondses' complaint specifically alleges Williamson induced Lisa to sign a release agreement retroactively accepting and approving his actions. Although Williamson stated that explaining all the settlement documents and their implications was not Kookie's job, when asked whether he was aware that Kookie had a conversation with Lisa concerning the document and all aspects of the settlement in Kemper County when she delivered the settlement release papers to the Edmonds home, Williamson replied: "Well, I'm sure knowing Kookie, she had a conversation with Ms. Edmonds, yes." In telephone conversations and correspondences, the Edmondses dealt primarily with Kookie. Williamson downplays Kookie's role in his operation. However, it was Kookie who did all the leg work in obtaining clients for Williamson. When Lisa received medical treatment for her heart condition, the receptionist at the doctor's office "came back with Kookie's name. She didn't give ... you know, Williamson law firm. She just said Kookie. Call her at this number." When Lisa contacted Kookie, Lisa testified: "Kookie told me that I might have to live on oxygen. And that I could possibly die from pulmonary hypertension. And that I needed to do something immediately or I would lose my rights. There's a time frame you have. And she suggested that I come and meet with her. She said she could be in the office the next day on a Saturday." Lisa testified

that she knew little about her condition and that "Kookie went into further detail with me." The complaint alleges and the depositions of the Edmondses show that Kookie played a far greater role than acknowledged by Williamson. The allegations of the complaint as supported through the Edmondses' depositions satisfactorily establish credible evidence of a factual basis to support their selection of venue in Kemper County. As such, the trial court did not act unjustly or improperly. The trial court clearly acted within the bounds of its authority in denying Williamson's venue challenge.

¶19.    Most important in establishing where accrual or substantial components of the claim took place, however, is Kookie's visit to Kemper County. The Edmondses expressed their dissatisfaction with the alleged unauthorized settlement amount and left the Neshoba County office without signing the documents one day before Kookie's visit to Kemper County. According to Larry, Kookie's understanding that a "contribution to the Mississippi Trial Lawyers Association ... was one of the conditions" for receiving the settlement amount Lisa had initially agreed to allegedly influenced their decision to sign the release and settle their claims. The Edmondses, who had walked out on Williamson the day before refusing to sign the release, talked with Kookie during her visit to their home and were ready to sign. Therefore, the visit, conversation, and representations are pivotal to the Edmondses' new claims, particularly as they pertain to the breach of duty of care and loyalty claims alleged. Much like the facts in *Tanksley*, the Edmondses claim that their injury was at least substantially, if not wholly, the result of Kookie's visit to Kemper County and conversation with the Edmondses. Kookie's visit and conversation with the Edmondses were the last legally significant facts. *See also **Earwood v. Reaves***, 798 So.2d at 513 (quoting ***Tanksley***, 608 So.2d at 1157). This case substantially occurred or accrued when the alleged tortious inducement by Williamson through Kookie took place in Kemper County. The injury did not occur due to the mere entry of the consent judgment. The Edmondses allege they were injured because they were not informed of all

9

the details of the settlement, were misled, or were outright lied to by Williamson and/or his agent, Kookie. Without the visit and conversation with Kookie and Williamson through contacts with the Edmondses in Kemper County, no consent judgment would exist as to the Edmondses. The consent judgment compounded the underlying injury suffered by the Edmondses as a result of the alledged misrepresentations, communications, and/or contacts they had with Kookie and Williamson via in-person contact, telephone conversations, and correspondences received in Kemper County. Thus, venue in Kemper County is proper.

¶20. In a breach of contract, duty of loyalty, and duty of care case, it is not unreasonable to infer that the communications between an attorney and his client are a substantial component of the claims. All correspondence was sent to Kemper County. Additionally, the content of the correspondences between the Edmondses and Williamson characterize the attorney-client relationship and directly put into play the question of whether the Edmondses were given full disclosure and were indeed made aware of the specifics of the settlement agreement. Although a part of their claim occurred in Holmes County where the consent judgment was entered, the cause of action did not accrue upon its entry but accrued during the conversation in Kemper County which influenced the Edmondses to sign the release. Even assuming that the Edmondses' causes of action did not accrue during their conversation with Kookie in Kemper County, substantial components of their claims occurred through correspondences, documents, phone calls, and personal contacts. What the Edmondses were told about the settlement in Kemper County via telephone, mail, and personal contact are all substantial components of their claims. The components, which occurred in Kemper County, are indeed the factual bases of their claims.

¶21. We hold that the trial court correctly applied the statute in this case and found credible evidence suggesting that the Edmondses' causes of action accrued and/or occurred in Kemper County such that

venue was proper therein. As such, the trial court did not abuse its discretion in denying Williamson's motion to change the venue.

## II. Whether the Trial Court Erred in Granting the Plaintiffs' Motion to Compel Disclosure and Production of Privileged Information?

¶22. "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Hewes v. Langston*, 853 So.2d 1237, 1244 (Miss. 2003) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby to promote broader public interests in the observance of law and administration of justice." *Id.* at 1249. "That purpose, of course, requires that clients be free to make full disclosure to their attorneys." *United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). In its version of the attorney-client privilege, Mississippi follows the uniform rule adopted by a majority of the states.

¶23. Rule 502(b) of the Mississippi Rules of Evidence defines the privilege as follows:

> (b) General Rule of Privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between himself or his representative and his lawyer or his lawyer's representative, (2) between his lawyer and the lawyer's representative, (3) by him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein, (4) between representatives of a client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

Miss. R. Evid. 502(b). *See also Jackson Med. Clinic for Women, P.A. v. Moore*, 836 So.2d 767, 771 (Miss. 2003); *See also* Miss. Rules of Professional Conduct R. 1.6. This Court has interpreted the scope of the attorney-client privilege under Mississippi law broadly, stating:

11

the privilege relates to and covers all information regarding the client received by the attorney in his professional capacity and in the course of his representation of the client. Included are communications made by the client to the attorney and by the attorney to the client. In that sense it is a two-way street.

*Barnes v. State*, 460 So.2d 126, 131 (Miss. 1984) (emphasis added). Further: "[t]he privilege does not require the communication to contain purely legal analysis or advice to be privileged." *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991) (applying Mississippi law). "Instead, if a communication between a lawyer and client would facilitate the rendition of legal services or advice, the communication is privileged." *Id.* at 875. A significant part of the attorney-client privilege for purposes of this appeal is the "common interest" privilege, as set forth in Miss. R. Evid. 502, cmt. (b)(3). According to the comment to the rule: "The privilege extends to statements made in multiple party cases in which different lawyers represent clients who have common interests." Miss. R. Evid. 502.

¶24.    Williamson asserts that they cannot disclose the confidential information surrounding the American Home settlement because the settlement pertains to thirty-one other clients. Mere joint representation cannot act as shield against an attorney malpractice action. Although there are no prior Mississippi cases which directly speak to the issues presented here, we are guided by the Mississippi Rules of Evidence, the Mississippi Rules of Professional Conduct, and the wisdom of our court in other states which have more squarely dealt with the issue here presented.

¶25.    In many jurisdictions, joint representation of clients creates an exception to the general rule barring the disclosure of material protected by the attorney-client relationship. The joint representation exception to the general rule barring disclosure is based on the assumption that all clients engaged in an aggregate settlement are entitled to disclosure.

> A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims or against the clients . . . unless each client consents after consultation, including the disclosure of the existence and nature of all the claims . . . involved and of the participation of each person in the settlement.

Miss. Rules of Professional Conduct 1.8(g).

¶26.    In absence of an opinion directly on point in Mississippi, the trial court prudentially relied upon the most similar facts and law as presented in *Scrivner v. Hobson*, 854 S.W.2d 148 (Tex. Ct. App. 1993). In *Scrivener*, former clients brought a legal malpractice action against their former attorney who represented them and other families in an environmental lawsuit, alleging that the attorney settled the lawsuit without authority, incorrectly calculated the value of their share of the settlement proceeds, and impermissibly divided the shares of settlement attributable to their property with prior landowners. The Texas Court of Appeals held that the documents requested regarding the aggregate settlement came within the exceptions to the attorney-client privilege. *Id.* at 151-52. In *Scrivner*, the court interpreted Rule 503 of the Texas Rules of Evidence, which is identical to Rule 502 of the Mississippi Rules of Evidence, holding that:

> Where parties display mutual trust in a single attorney by placing their affairs in his hands, the attorney must disclose to the others all opinions, theories, or conclusions regarding the clients' rights or position to other parties the attorney represented in the same matter. *Cousins v. State Farm Mut. Auto. Co.*, 258 So.2d 629. 636 (La. App. 1972). With regard to the attorney-client privilege, the general rule is that, as between commonly represented clients, the privilege does not attach to matters that are of mutual interest. See *Tex. R. Civ. Evid.* 503(d)(5). Hence, it must be assumed that if litigation eventuates between the clients, the privilege will not protect any such communications, the client should be so advised.

854 S.W. 2d at 151.

¶27.    Under Mississippi Rule of Professional Conduct 1.8 (g), documents requested in discovery involve matters of interest common to all the plaintiffs involved in the aggregate settlement. The logic of

*Scrivner* indicates that when an attorney represents joint clients in obtaining a joint settlement for which no individual negotiations on behalf of any one client were undertaken, the client may have access to the documents which pertain to the case. *Id.* In regard to an attorney's duty to his client, the *Scrivner* court stated that the documents requested "are relevant to the claims of the [former clients] that the proceeds of the aggregate settlement were improperly and fraudulently distributed among the various plaintiffs in the environmental lawsuit." *Id.* The *Scrivner* court held that the former clients could obtain discovery of the documents under the exceptions to the attorney-client or attorney work product privileges. *Id.*

¶28.     We agree with the trial court's analysis of this case. We concur that by virtue of representing some thirty-one clients jointly in litigation, mediation and settlement, the joint client exception to the Mississippi Rules of Evidence is applicable in this case such that Williamson cannot shield himself from a motion to compel discovery based on the attorney-client privilege. Under Mississippi Rule of Professional Conduct 1.8(g), Williamson obtained a lump sum aggregate settlement for all of his clients during settlement negotiations. In determining whether the proceeds of the aggregate settlement were improperly or fraudulently distributed among the various plaintiffs in the American Home suit, the information requested by the Edmondses is highly relevant to their claims of breach of contract and breach of the duties of care and loyalty. The client is entitled to know the amount of the settlement, and the basis for the calculations, distributions and accounting of the proceeds of the settlement with American Home.

¶29.     Additionally, Williamson asserts that the physician-patient privilege prevents disclosure of the documents. However, Miss. R. Evid. 503(a)(4) defines a communication as confidential only where it is not intended to be disclosed to third persons. Additionally, [a]ny party to an action or proceeding . . . who by his or her pleadings places in issue any aspect of his or her physical, mental, or emotional condition thereby and to that extent only waives the privilege otherwise recognized. . . ." Miss. R. Evid. 503(f).

14

The comment to this rule suggests the waiver should only apply to the American Home action. The comment is persuasive, however, because the plaintiffs in the American Home settlement used their medical condition as a sword to further their case against the company, they cannot now use the physician-patient privilege as a shield to entirely protect information which weighed heavy in the negotiation and settlement of their case and is highly relevant to the Edmondses' malpractice action.

¶30. Finally, Williamson argues that the confidentiality agreement signed by the Edmondses and the QSF order purporting to seal the settlement prohibit disclosure of the information sought. The confidentiality agreement and the QSF order were put into place to prevent public dissemination of any information indicating the existence of litigation or settlement, not to prevent the Edmondses from obtaining information relating to the case they participated in as plaintiffs.

¶31. This Court adopts a modified, narrower view of *Scrivner*. This problem in conjunction with the aforementioned privilege issues presented is easily remedied by the trial judge. Instead of opting for the most severe course of action and barring the Edmondses from obtaining this potentially highly relevant information due to privilege, the confidentiality agreement or the QSF order, or requiring all documents requested to be disclosed as in *Scrivner* and as the trial court ordered here, we hold that the following procedure shall be followed. On remand, the trial court shall review all of the documents objected to by Williamson and the other American Home plaintiffs. The trial court shall conduct an in-camera inspection of all documents requested in discovery and objected to by Williamson to ascertain relevancy and admissibility in the Edmondses' case at bar. The trial court shall require of the defense counsel to redact all information specifically identifying the other plaintiffs (i.e. name, address, etc.) in the American Home settlement, medical records of other plaintiffs, documents related to attorney/client issues, and any other information the trial court holds should be redacted. With respect to the persons about whom settlement

and medical information has been requested, Williamson shall provide the Edmondses a chart which lists the persons, identified only as #1, #2, #3, etc. For each person, the defendant shall provide: (1) the medical diagnosis, (2) additional information, if any, which affected the amount of settlement, and (3) the amount of settlement. In the event that the Edmondses request verification of the information provided by Williamson, Williamson shall provide medical records, settlement documents and other such documents as are necessary to the trial court, in camera, so that the trial court can verify the accuracy of the information on the chart. The trial court shall allow a reasonable time for inspection of the redacted documents by the person, or his or her counsel, before the documents are produced to the Edmondses.

¶32. Enabling members of the bar to wholly shield themselves from malpractice actions through the invocation of privileges, confidentiality agreements, and QSF orders would do a tremendous disservice to the public at large, as well as the legal profession . Indeed, if this Court found otherwise, a dangerous precedent would be set encouraging attorneys to advise their clients to sign and agree to confidentiality agreements and QSF orders in order to sidestep potential malpractice liability after a case is settled.

### Conclusion

¶33. For the reasons set out above, we agree with the Circuit Court of Kemper County and hereby affirm its judgment and remand this case with instructions for further proceedings consistent with this opinion.

¶34. **AFFIRMED AND REMANDED.**

      **COBB, P.J., CARLSON AND DICKINSON, JJ., CONCUR. WALLER, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY AND RANDOLPH, JJ. EASLEY, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, P.J., AND RANDOLPH, J. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**

**WALLER, PRESIDING JUSTICE, DISSENTING:**

¶35.    I respectfully disagree with the majority's finding that venue is proper in Kemper County. Clearly, under the circumstances of this case, venue is proper in Neshoba County.

¶36.    Williamson's main office is in Neshoba County in the City of Philadelphia. He resides in Neshoba County. Williamson's first meeting with Lisa Edmonds was in his Philadelphia office. A few days later, Lisa returned to Philadelphia to sign a contract of representation. All settlement documents were signed in Philadelphia.

¶37.    In support of retaining venue in Kemper County, the majority cites the venue statute and contacts made by Williamson's office in Kemper County. The venue statute which was in effect at the time of the filing of the Edmondses' complaint, provides that suit may be filed where the defendant or any of them may be found or where the cause of action may occur or accrue. Miss. Code Ann. § 11-11-3(1). It is evident that the defendants (Williamson, personally, Edward A. Williamson, P.A.) may be found in Philadelphia, where Williamson's office is and where the legal services were performed. The alleged wrongdoing took place in Philadelphia. It did not take place in Kemper County, and Williamson and Williamson P.A. cannot be found in Kemper County.

¶38.    Kemper County contacts include correspondence received in Kemper County and one visit by a Williamson employee, Kookie Bowles. All correspondence and documents the Edmondses received in Kemper County were drafted in Neshoba County. The majority also emphasizes the role that Williamson's assistant, Kookie, played. Kookie played only a minor role. All of her contacts, except for *one* visit to Kemper County, took place while Kookie was in Neshoba County. As to the alleged fraudulent inducement that occurred during this visit, no action was taken until Lisa went to Williamson's office to sign

17

the settlement documents. Therefore, under *Flight Line, Inc. v. Tanksley*, 608 So.2d 1149, 1155-57 (Miss. 1992), the final act of the alleged fraudulent inducement occurred in Neshoba County.

¶39.    Therefore, I would find that the circuit judge abused his discretion by not transferring venue to Neshoba County.  I respectfully dissent.

**EASLEY AND RANDOLPH, JJ., JOIN THIS OPINION.**

**EASLEY, JUSTICE, DISSENTING:**

¶40.    Because I fear that this decision rendered by the majority today will have a far reaching and adverse effect on businesses operating in Mississippi, I am compelled to dissent.  In my opinion, affirming the trial court's retention of venue in Kemper County based on the tenuous argument made by the Edmondses and accepted by the majority will expand the permissible venues for lawsuits against all businesses and professionals that operate in Mississippi.

¶41.    Williamson is a resident of Neshoba County.  Williamson's principal law office is located in Neshoba County.  Williamson also maintained an office in Holmes County for purposes of handling the *Annette Williams, et al. v. American Home Products Corp.* litigation.  The Edmondses are residents of Kemper County.  Lisa Edmonds's meetings to retain Williamson and to sign a contract for representation all occurred at Williamson's office in Neshoba County.  The Edmondses signed the settlement documents at Williamson's office in Neshoba County. Williamson's negotiations and conferences took place in Neshoba County.  The QSF order and releases to settle the Edmondses' claim was entered in the Circuit Court of Holmes County.  Williamson's office made telephone calls, sent documents via US Mail and on one occasion sent his assistant, Kookie Bowles, as a courier to hand-deliver a document to Lisa Edmonds at her home in Kemper County.

¶42. The majority contends that Kookie's delivery of the document to the Edmondses is the pivotal point in this case. The majority's position is that Williamson sent Kookie to the Edmondses' home in Kemper County to get them to agree to settle after they had previously refused to settle. This is not supported by Williamson's deposition in which he stated that it was not Kookie's job to advise a client to settle. He stated that she was merely sent to furnish the Edmondses with the settlement information so they would be fully informed as to what was going on in the case.

¶43. The record is silent as to Kookie's account or version of events, and the majority relies heavily on excerpts from Williamson's deposition to support its conclusion that Kookie induced the settlement in Kemper County. The majority argues that the Edmondses failed to sign the release to settle the claims, prompting Williamson to send his assistant, Kookie, to hand-deliver the release. The majority's position is that Kookie negotiated with the Edmondses to induce them to sign the settlement agreement. However, the record does **not** actually reflect that Williamson made such a statement. The record excerpt reflects that Kookie was sent to hand-deliver the confidentiality agreement for the Edmondses to review. In Williamson's deposition, the record reflects:

| | |
|---|---|
| Mr. Healy: | And isn't it correct that sometime in 2001, that Kookie Bowles brought the confidentiality agreement to Kemper County to Ms. Edmonds for the purpose of getting her to acquiesce to the document? |
| Mr. Williamson: | I wouldn't characterize it in that way at all. |
| Mr. Healy: | How would you characterize it? |
| Mr. Williamson: | I knew I was leaving, and we had had the conversation -- a conversation which is referred to by the previous testimony the day before on a Sunday in my office. I knew I was going to be out of town, and I knew that all the releases were in except Ms. Edmonds's. And I felt -- I'm cautioned against saying what I fell instead of what I want I -- **I determined that she must be given full information on this and made completely aware that we had to have these in, that we -- the date had been determined to Wednesday, and that if she** |

19

|  |  |
|---|---|
|  | **wanted to participate in this litigation settlement, that she be given full opportunity to do that. I wanted her to have the benefits of it, and I was going to be out of town myself. And I wanted that brought to her attention.** I don't have a specific recollection, but I am sure that I did, in fact, ask Kookie to make sure that one way or the other, Ms. Edmonds had that in her hands. I was not trying to get her to acquiesce into anything. I wanted her to have an opportunity to participate. |
| Mr. Healy: | **Was part of Kookie Bowles's responsibility on this particular day, the Monday after your Sunday meeting, to further explain to them all implications of this document?** |
| Mr. Williamson: | **No, no. That was not her job at all....** |

(emphasis added).

¶44.    The Edmondses never deposed Kookie, and the court papers do not reflect that Kookie was ever noticed to be deposed. Furthermore, Williamson never stated that he sent Kookie to convince the Edmondses to settle their claims but merely for her to drop off the settlement information.

¶45.    In fact, according to Lisa Edmonds's testimony, it was Williamson who allegedly induced her to settle or she would have to get another attorney. This occurred *before* Kookie went to Kemper County and occurred in Williamson's law office in Neshoba County, Mississippi, on Sunday, May 6, 2001. **Obviously, Lisa Edmonds knew Williamson's position regarding signing the confidentiality agreement prior to Kookie going to Kemper County on the following Monday to deliver the settlement information.** Lisa Edmonds testified as to the May 6th meeting in Williamson's office as follows:

|  |  |
|---|---|
| Mr. Clark: | Tell me what happened at that meeting, who was present and what occurred as you recall it. |
| **Ms. Edmonds:** | **Who was present was Mr. Williamson, my husband and myself, May the 6th.** |

20

Mr. Clark: This was May the 6th?

Ms. Edmonds: Uh-huh.

Mr. Clark: All right. What occurred at that meeting?

Ms. Edmonds: I had told him what I wanted for my settlement, and he was encouraging me to take a structured settlement, which I was adamant about not taking, because I can manage my own money. And he had told me in a conversation that he could get me where I wanted to be, that he had some "wiggle room," were his exact words, wiggle room, and if we would come into his office and talk to him, we could work something out.

Mr. Clark: He told you that before you came to his office that morning?

Ms. Edmonds: That is correct. That is correct.

Mr. Clark: All right. So what happened on that Sunday morning?

Ms. Edmonds: When I got --

**Mr. Healy: Are you talking about Sunday morning in May?**

Ms. Edmonds: May the 6th.

Mr. Healy: Thank you.

**Ms. Edmonds:** We're kind of jumping around. Sorry. When I walked in, we -- we greeted, and I think he actually hugged me. You know, up until this point, we've still got a good relationship. **I believe Mr. Williamson had some death in his -- deaths in his family, so I'm sure it was a bad time for him, too, and my husband realized that, too, it was a bad time for him, and we probably didn't need to be discussing this information when he was already clearly upset.**
But we did, and when I walked in, he had structured settlement printout from this firm, Jolly and somebody from Alabama. And on the first printout he showed me, it had my net settlement or not net. What I saw is the dollar figure that I'll be putting into the settlement. It was 1.12, I believe, 1.12, and I said --

Mr. Clark: That's million?

**Ms. Edmonds:** Million. That I'll be putting in. **He was going to show me how over time I could grow this money to get to where I wanted to be at this day in present time, and it would take like a lot of years. I told him, that's not what we discussed on the phone. That's not it. So as time went on, he produced another sheet, and it had on there 1.25.**

Mr. Clark: "As time went on' in that same meeting or at a later time?

**Ms. Edmonds:** Oh, at this same meeting. **And it also showed the breakdown of how much I could take now, and over time I would get to where I wanted to be at the 1.5.**
And then I realized, you know, that's not what we discussed. I was getting agitated, and he was, too. At some point in time, he

| | pulled off his coat and hurled it across the room in this empty chair, and by then I'm clearly upset, because he's my attorney, and we're supposed to have a good relationship, and I'm supposed to be able to talk to him and have a good relationship, and it's starting to get really tense in the room. |
|---|---|
| Mr. Clark: | What else do you remember about the meeting? |
| **Ms. Edmonds:** | I remember -- it was really bad. I told -- **he wanted me to sign a gag order, or I believe it's a settlement release, and he needed that signed, because he could not do the -- well, no -- he didn't call it do the deal, but he told me he had to have everybody signed, and he had to have the paperwork to American Home Products.** It was a done deal, it was over. There were no more negotiations, and basically, **I could take it or leave it, and if I didn't take it, he could no longer represent me, and if I didn't sign the paperwork, then I would be dropped as a client, and I would have to find me another attorney**, and if I didn't trust him, I could also find another attorney. I remember him saying that, "if you don't trust me, you can go find you another attorney right now." |

(emphasis added).

¶46.    **Later**, on two separate dates, the Edmondses in fact voluntarily chose to sign the settlement releases in Williamson's office before a notary public. The fact remains that Williamson advised the Edmondses that they could get another attorney. Williamson did not say that he would settle their claims against their will or that their claims had been settled without their consent. The Edmondses had the right and were obviously advised, according to Lisa Edmonds's own testimony, of their option to retain new counsel to file suit against American Home if they did not wish to participate with other Williamson clients in the settlement of the litigation pending in the Holmes County Circuit Court. Williamson informed the Edmondses that if they wished for him to continue to represent them, they had to participate in the

22

settlement along with all of the Williamson clients represented with claims against Williamson.[1] The Edmondses returned to Williamson's office and signed the releases.

¶47. The majority states that "when asked whether he was aware that Kookie had a conversation with Ms. Edmonds concerning the document and all aspects of the settlement in Kemper County when she delivered the settlement release papers to their home, Williamson replied: 'Well, I'm sure knowing Kookie, she had a conversation with Ms. Edmonds, yes.'" However, the majority does not quote Williamson's entire response.

¶48. The portion of Williamson's deposition noted by the majority suggests that Williamson had knowledge that a conversation actually took place regarding the settlement. That is not accurate. The record actually reflects that Williamson stated that:

> Well, I'm sure that knowing Kookie, she had a conversation with Ms. Edmonds, yes. *I wasn't there*, and was in -- out of town at the time, and, you know, *I have no reason to say, yea or nay on that*.

(emphasis added).

¶49. Viewing Williamson's actual testimony, he did not state that he knew such a conversation took place between Kookie and Lisa Edmonds. Additionally, the Edmondses never deposed Kookie to inquire, for the record, what the alleged conversation entailed or whether it actually occurred. **Despite any discussion as to Kookie, the record reflects that both of the Edmondses signed the confidentiality agreement in Neshoba County on separate dates before a notary public.**

---

[1] Since the confidentiality agreement is sealed in the Circuit Court of Holmes County and not available in the record of review, we are without information to review the terms of the settlement agreement to know if it included a provision to prevent Williamson from representing any clients against American Home in the future as many of these types of settlement agreements may require no future litigation by a specific attorney. However, the fact remains that the Edmondses could have retained new counsel to file suit if they did not want to accept the terms of the settlement and proceed with Williamson as their attorney.

Williamson settled the Edmondses' claim in Holmes County where the QSF order containing the confidentiality provision was entered by the Holmes County Circuit Court as to all parties to the settlement. Furthermore, the Edmondses did not sign the settlement releases in Kemper County when Kookie was present, but rather they traveled to Neshoba County to sign the document.

¶50. The trial court found that:

> This [c]ourt is of the opinion that at least part of the [p]laintiff's causes of action occurred or accrued in Kemper County. A plaintiff is entitled to choose among proper venues where to file her case. Therefore, the [p]laintiffs' alleged claims of breach of contract, negligence and breach of fiduciary duty accrued in Kemper County. The [c]ourt finds that venue is proper in Kemper County and the Motion to Dismiss or to Transfer to Holmes County Circuit Court is denied.

¶51. On appeal, Williamson requests this Court to remand this case to have venue transferred to either Holmes County or Neshoba County. Williamson maintains that venue in Kemper County was improper, as the alleged cause of action actually occurred in Holmes County where the Edmondses' claim was settled and the QSF order and its confidentiality provisions was entered, or in the alternative, Neshoba County where Williamson was retained by the Edmondses, all the settlement documents were subsequently signed by the Edmondses, Williamson resides and Williamson's primary office is located.

¶52. Miss. Code Ann. § 11-11-3(1) provides the county in civil actions should be commenced, stating:

> Civil actions of which the circuit court has original jurisdiction shall be commenced in the county where the defendant resides or in the county where the alleged act or omission occurred or where the event that caused the injury occurred. Civil actions against a nonresident may also be commenced in the county where the plaintiff resides or is domiciled. Civil actions alleging a defective product may also be commenced in the county where the plaintiff obtained the product.

¶53. However, as the majority correctly states, the Edmondses filed their complaint in this action on July 15, 2002. As such, the amendments to the statute which went into effect on January 1, 2003, are not applicable to the case sub judice as per Section 16 of Laws 2002, 3d Ex. Sess., ch. 4 which states: "This

24

act shall take effect and be in force from and after January 1, 2003, and shall apply to all causes of action filed on or after that date." The applicable venue statute, prior to amendment, reads as follows:

> Civil actions of which the circuit court has original jurisdiction shall be commenced in the county in which the defendant or any of them may be found or in the county where the cause of action may occur or accrue and, if the defendant is a domestic corporation, in the county in which said corporation is domiciled or in the county where the cause of action may occur or accrue, except where otherwise provided, and except actions of trespass on land, ejectment and actions for the statutory penalty for cutting and boxing trees and firing woods and actions for the actual value of trees cut which shall be brought in the county where the land or some part thereof is situated.

¶54. In *Tanksley*, an airplane was improperly loaded in Warren County, Mississippi. *Tanksley*, 608 So.2d at 1153-54. The plane flew to Chicago, Illinois, where Tanksley was injured while unloading the plane. *Id*. Tanksley's injury was the result of the improper loading. *Id*. This Court found venue to be proper in Warren County since the injury could not have occurred without the negligent action. *Id* at 1156-57. We stated:

> In the final analysis, venue is about convenience. The legislative prescription implies a legislative finding counties meeting certain criteria will generally be more convenient to the parties. The use of "occur" makes sense because important witnesses will often be accessible where the action occurs. Yet, there is nothing in the phrase "where the cause of action may occur...." that limits the judicial search for but a single county. Torts arise from breaches of duties causing injuries, and it is common experience that breach and causation and impact do not all always happen at once. At the very least, the word "occur" connotes each county in which a *substantial component* of the claim takes place, and this may include, in the present context, the negligent conduct which substantially undergirds Tanksley's claim.

*Tanksley*, 608 So.2d at 1157 (emphasis added).

¶55. For venue purposes, a cause of action accrues "either where the actual tortious conduct occurs or where the plaintiff suffers actual injuries from the negligence." *Wal-Mart Stores, Inc. v. Johnson*, 807 So.2d 382, 387 (Miss. 2001). This Court defined and distinguished the "occur" and "accrue" language in *Tanksley*, 608 So.2d at 1156, by stating:

25

'Occur' and 'accrue' are not synonymous, legally or otherwise, as the disjunctive connector forthrightly suggests. We read accrual in its formalistic sense. A cause of action accrues when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested ... this may well mean the moment injury is inflicted, that point in space and time when the last legally significant fact is found...

¶56.    In the case sub judice, venue was not proper in the Circuit Court of Kemper County. The alleged breach of Williamson's duty of care, contractual obligations or fiduciary duty related to the terms of the settlement and disbursement of the settlement proceeds did not **occur** until the settlement documents were executed by the Edmondses in Neshoba County or until the settlement order, including all of Williamson's 31 clients, was entered by the Holmes County Circuit Court. Therefore, the substantial components of the claim occurred in Neshoba County and Holmes County, not in Kemper County.[2]

¶57.    Likewise, the Edmondses' allege breach of Williamson's duty of care, his contractual obligations or his fiduciary duty as related to the term of settlement and disbursement of the settlement proceeds could not have accrued until the Edmondses agreed to accept the terms of the settlement and the case was settled.

¶58.    The point that the majority argues that a claim accrued is when the Edmondses were furnished information on the settlement agreement. However, the Edmondses did not sign the documents until in Williamson's office in Neshoba County. The settlement of the Edmondses' claims was entered in Holmes County. Williamson never met with the Edmondses in Kemper County. Williamson conducted all negotiations with the Edmondses in Neshoba County.

---

[2] In the trial court, Williamson's motion was to transfer to the Circuit Court of Holmes County. Williamson also argued that Holmes County Circuit Court would be the court that would have to unseal the confidential settlement terms. However, on appeal, Williamson argues that venue would be proper in either Holmes County or Neshoba County.

¶59.    The Edmondses' suit against Williamson centers on the terms of contract for representation, the confidentiality agreement entered in the Circuit Court of Holmes County and receiving the medical histories and the settlement information on the other clients involved in the *American Home* litigation. The Edmondses' complaint against Williamson alleges that he charged a higher percentage, 45%, for his attorney fees based on having filed suit before the case was settled. The Edmondses contend that since they were not named plaintiffs in the lawsuit, Williamson's percentage should have been 33 1/3 % because a suit was not filed for them. The Edmondses also contend that Williamson withheld a 3% settlement fee from the settlement proceeds that was not stated in the original contract for representation on November 17, 2000, but in a subsequent acknowledgment of expenses on May 9, 2001.

¶60.    The Edmondses claim that Williamson took more than he was assigned to receive in the contract for representation. The Edmondses also seek information regarding how the settlement funds were disbursed among the other clients and the amounts that each of the other clients received. The Edmondses also seek to have Williamson release information regarding the settlement that Williamson argues would be a violation of the terms of the confidentiality agreement, as well as, a violation of the attorney-client privilege.

¶61.    The pivotal point of the claims against Williamson both accrued and occurred when Williamson was retained as counsel, conducted conferences with the Edmondses regarding their claims, entered into the settlement negotiations with the Edmondses, all in Neshoba County. The Edmondses also signed the contract of representation and all settlement paperwork in Neshoba County. The terms of the settlement were sealed by the Holmes County Circuit Court to remain confidential.

¶62.    Furthermore, American Home was party to the litigation in the Holmes County Circuit Court and to the QSF order and the confidentiality provisions contained therein. At this time, American Home has

not been brought into these proceedings to be afforded the opportunity to contest lifting the confidentiality seal regarding the terms of the settlement in the *Annette Williams, et al. v. American Home Products Corp.* litigation entered in the Circuit Court of Holmes County.

¶63. For the foregoing reasons, I therefore must respectfully dissent. Neshoba County is where: (1) Williamson's main office is located; (2) the initial consultation between Williamson and the Edmondses occurred; (3) the contract of representation between Williamson and the Edmondses was entered into; (4) the settlement documents were executed; and (5) Williamson resides. Therefore, venue is proper in Neshoba County, not Kemper County. The Circuit Court of Kemper County erred in retaining the matter.

¶64. Allowing this case to remain in Kemper County will be a precedent to allow every business or professional to be sued in multiple jurisdictions based solely on contact by correspondence or telephone with its customers or clients. This will have a profound effect of expanding the permissible venues for suits against every professional and business. Therefore, in my opinion, the case should be reversed and remanded for transfer to the Circuit Court of Neshoba County.

**WALLER, P.J., AND RANDOLPH, J., JOIN THIS OPINION**.