950 So.2d 1098 (2007)
Mary Anne BRABHAM, Appellant
v.
Charles Robert BRABHAM, Appellee.
Mary Anne Brabham, Appellant
v.
Charles Robert Brabham, Appellee.
Nos. 2005-CA-01437-COA, 2005-CA-02335-COA.
Court of Appeals of Mississippi.
March 6, 2007.
*1099 Erik M. Lowrey, Hattiesburg, Robert R. Marshall, West Point, attorneys for appellant.
Terry L. Caves, Laurel, Jerry Dean Sharp, attorneys for appellee.
Before LEE, P.J., BARNES and ISHEE, JJ.
LEE, P.J., for the Court.

FACTS AND PROCEDURAL HISTORY
¶ 1. Mary and Charles Brabham were married on June 13, 1990. No children were born of the marriage. Mary and Charles (Bob) separated on July 28, 2003. On August 5, 2003, Mary filed for divorce in the Jones County Chancery Court on the grounds of habitual cruel and inhuman treatment, habitual use of alcohol, and, in the alternative, irreconcilable differences. Shortly thereafter Bob filed an answer. An agreed temporary order was entered on October 28, 2003, wherein Bob was ordered to pay $1,000 per month as temporary alimony as well as pay Mary's health insurance, car payments, the house note and other joint debts. Bob was allowed use of the marital home.
¶ 2. After over a year of filing amended complaints and answers by both parties wherein other grounds for divorce were *1100 asserted, both parties ultimately consented to an irreconcilable differences divorce. An order withdrawing the fault grounds for divorce was entered on the record January 13, 2005. On May 16, 2005, the chancellor issued his final judgment. The chancellor denied Mary alimony, awarded Mary fifty percent of the equity in the marital home ($2,274.16), awarded Mary ten percent of the value of Bob's retirement account as of October 28, 2003, awarded Mary ownership of the Miata, awarded Bob the Yukon and the all-terrain vehicle, and ordered Bob to pay $3,500 towards Mary's attorney's fees.
¶ 3. Mary then filed a motion to amend the findings of fact, a motion for relief from judgment and a motion to amend the judgment. Bob responded. On June 28, 2005, the chancellor entered an order to clarify that Mary was to receive ten percent of the total value of Bob's retirement account and ordered the parties to submit information reflecting the total value of the account as of October 28, 2003.
¶ 4. On June 30, 2005, Mary filed a notice of appeal, asserting the following issues: (1) the chancellor was manifestly wrong in figuring the marital estate; (2) the chancellor abused his discretion in the equitable distribution of the assets; (3) the chancellor was wrong as a matter of law in excluding certain documents from evidence; and (4) the chancellor abused his discretion in denying Mary alimony.
¶ 5. On May 5, 2005, prior to the chancellor's final judgment, Mary filed a complaint alleging that Bob was in contempt for failing to pay the temporary support as ordered on October 28, 2003. After a hearing on the matter, the chancellor found that Bob was not in contempt. The chancellor also found Mary to be in contempt for failure to abide by the court's June 28, 2005, order. Mary also appeals this ruling, arguing that the chancellor erred in denying her past due support. For clarity, these separate appeals have been consolidated and the issue on the second appeal will be addressed last.

STANDARD OF REVIEW
¶ 6. This Court will not disturb the findings of a chancellor unless we find an abuse of discretion, an erroneous application of law, or manifest error. Andrews v. Williams, 723 So.2d 1175, 1176(¶ 7) (Miss. Ct.App.1998). Thus, if we find substantial evidence in the record to support the chancellor's findings, we will not reverse. Wilbourne v. Wilbourne, 748 So.2d 184, 186(¶ 3) (Miss.Ct.App.1999).

DISCUSSION
I. DID THE CHANCELLOR ERR IN DETERMINING THE MARITAL ESTATE?
II. DID THE CHANCELLOR EQUITABLY DIVIDE THE MARITAL ESTATE?
¶ 7. In her first and second issues on appeal, Mary argues that the chancellor erred in determining and dividing the marital estate. Along with her argument that she should have received a greater portion of Bob's retirement account, Mary contends that the chancellor should have divided the marital estate equally. However, we note that equitable distribution does not mean equal distribution. Chamblee v. Chamblee, 637 So.2d 850, 863-64 (Miss.1994). The proper legal standard to be applied in equitably dividing the marital estate is found in Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994). The Ferguson factors to be considered in determining contribution are as follows:
1. Substantial contribution to the accumulation of the property.

*1101 a. Direct or indirect economic contribution to the acquisition of the property;
b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties, and duration of the marriage; and
c. Contribution to the education, training, or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn, or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income, and earning capacity; and
8. Any other factor which in equity should be considered.
Id. at 928. The chancellor correctly cited these factors in his findings of fact and conclusions of law.
¶ 8. The chancellor found that Bob made almost all of the financial contributions to the parties' marriage and that Mary made little or no financial contribution. Bob also handled the majority of the household duties. Mary worked part-time sporadically and was not inclined to seek new employment. In anticipation of leaving Bob, Mary diverted a portion of Bob's money into a checking account in her name to rent an apartment for six months. During this time Mary was involved with another man. The marital home was valued at $77,000 as of January 29, 2004, and Bob had been paying the note on the house every month. The chancellor awarded one-half of the home's equity to each party.
¶ 9. The chancellor determined that Bob had earned 45.4% of his retirement during the thirteen year marriage. Ultimately, Mary was awarded ten percent of the value of the retirement account, which had a value of approximately $195,000 as of October 28, 2003. The chancellor also found that, although Mary was less financially secure than Bob, she was capable of engaging in full-time employment. Even Mary's expert witness testified that she could return to full-time employment. Furthermore, the chancellor noted that Mary was not employed because she was receiving temporary support from Bob as well as additional financial support from her boyfriend.
¶ 10. The chancellor noted that Mary's behavior caused the termination of the marriage. There was testimony, namely by her own children from a previous marriage, that Mary was prone to fabricating outrageous lies, including allegations of abuse and that Mary attempted to get her daughter's husband to arrest Bob. There *1102 was also testimony that Mary abused alcohol and had serious emotional problems. Bob testified that Mary refused to have sexual intercourse with him for three years.
¶ 11. The chancellor awarded Bob the marital home, his Yukon, personal property and the majority of his retirement account. Bob's debts included approximately $12,000 for the Yukon; an AmSouth Essential Line debt of approximately $14,769; the Discover card balance of $4,989.44; the Direct Merchants credit card balance of $2,032; the house mortgage of approximately $72,451; a final car payment of $947; and a $16,749 loan from Bob's retirement account. Mary was awarded one-half of the equity in the marital home; her Miata valued at $12,000; approximately $19,562 from Bob's retirement account; and a bank account in her name containing $1,000. Mary had already taken approximately $5,695 worth of personal property from the marital home. The chancellor, although awarding Mary fewer of the marital assets, did not assess any of the marital debts to Mary. Bob was also ordered to contribute $3,500 towards Mary's attorney's fees.
¶ 12. We find that substantial evidence exists to support the chancellor's determination; thus, this issue is without merit.
III. WAS THE CHANCELLOR WRONG AS A MATTER OF LAW FOR EXCLUDING CERTAIN EVIDENCE?
¶ 13. In her third issue on appeal, Mary argues that the chancellor erred in excluding evidence of certain documents from the parties' joint counseling sessions. Mary claims that the chancellor should have allowed into evidence these documents which would have supported her allegations of abuse by Bob. The chancellor, relying upon Rule 503 of the Mississippi Rules of Evidence, found that transcripts from Bob and Mary's joint counseling sessions could not be admitted into evidence since Bob objected. Rule 503(b) states as follows:
A patient has a privilege to refuse to disclose and to prevent any other person from disclosing (A) knowledge derived by the physician or psychotherapist by virtue of his professional relationship with the patient, or (B) confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.
The chancellor also found that the exception under Rule 503(f) did not apply as Bob did not assert that his physical, mental or emotional condition was an issue in the case. Mary contends that Bob placed the issues of his physical, mental and emotional condition before the chancellor and asserts that Williamson v. Edmonds, 880 So.2d 310 (Miss.2004), is directly on point. However, Williamson concerned a legal malpractice action wherein the attorney had represented the plaintiffs in a personal injury suit and their medical condition was the sole issue. Id.
¶ 14. We can find no error by the chancellor in excluding these documents; thus, this issue is without merit.
IV. DID THE CHANCELLOR ERR IN DENYING MARY ALIMONY?
¶ 15. In her final issue on appeal, Mary argues that the chancellor erred in failing to award her alimony. Mary claims that the chancellor did not weigh the factors *1103 as enumerated in Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993). The Armstrong factors, which are to be considered in making an alimony award, are as follows:
1. The income and expenses of the parties;
2. The health and earning capacities of the parties;
3. The needs of each party;
4. The obligations and assets of each party;
5. The length of the marriage;
6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
7. The age of the parties;
8. The standard of living of the parties, both during the marriage and at the time of the support determination;
9. The tax consequences of the spousal support order;
10. Fault or misconduct;
11. Wasteful dissipation of assets by either party; or
12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.
Id. at 1280.
¶ 16. Mary is under the impression that the sole reason the chancellor denied her alimony was her adulterous behavior. The chancellor did state her adulterous behavior as one reason for denying alimony, but it is also clear from the record that the chancellor was unimpressed with Mary's work history, her extreme behavior, and her unwillingness to contribute either directly or indirectly to the marriage. Although the chancellor did not specifically list each Armstrong factor numerically, he considered each one of the factors in making his determination. We find no error.
V. DID THE CHANCELLOR ERR IN DENYING MARY PAST DUE SUPPORT?
¶ 17. In her consolidated issue on appeal, Mary argues that the chancellor erred in denying her past due support as required under the temporary order of October 28, 2003. Specifically, Mary claims that Bob owed her $1,620.16 in past due support. "Mississippi has allowed a payor spouse alimony credit for amounts paid to or on behalf of the payee spouse even though those payments have not taken the traditional form of a personal check marked `alimony.'" Franklin v. Franklin, 864 So.2d 970, 978(¶32) (Miss.Ct.App. 2003).
¶ 18. Bob contends that he should be given credit for other payments made to Mary, including approximately $700 Mary withdrew from an equity line of credit which Bob had to repay. Bob testified that, while he was working in Algeria, Mary reported the equity line account card stolen, had another one re-issued and then drew money from the account. Although not required by the temporary order, Bob paid $1,236.50 in insurance on the Yukon during the separation. Bob testified that Mary was driving the Yukon during the separation. Bob also reimbursed Mary $354.32 for her medications from Rite Aid. The chancellor denied Mary relief, finding that it was acceptable for Bob to take credit for payments not listed in the temporary order, namely the car insurance and the drug bills. We find no error in the chancellor's decision.
¶ 19. We note that, during this hearing, the chancellor found that Mary had not cooperated with his prior order granting the divorce. The chancellor then gave Mary seven days within which to sign the deed to the house and other paperwork *1104 necessary to receive her interest in Bob's retirement account or he would authorize the issuance of a capias for her arrest.
¶ 20. THE JUDGMENT OF THE JONES COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.