ISHEE, J.,
for the Court.
¶ 1. Gulfport-Biloxi Regional Airport Authority (GBRAA) filed suit against the Montclair Travel Agency, Inc. and its agent, Peter A. Zimmermann (collectively referred to as “Montclair”), in the Circuit Court of Harrison County. The circuit court granted Montclair’s motion for directed verdict. Aggrieved by this decision, GBRAA appeals. Finding error, we reverse and remand.
FACTS
¶ 2. In 1999, Ken Spirito, the Assistant Executive Director of GBRAA, saw an advertisement in the newspaper about a Concorde flight out of the Mobile Regional Airport. After conducting some research, Spirito contacted Montclair by telephone and spoke with Zimmermann. Spirito described the “diverse economy” of the area to Zimmermann, and he expressed his interest in having the Concorde fly out of Gulfport-Biloxi International Airport (GBIA); Zimmermann stated that he would be in touch. On November 29, 2001, Zimmermann sent a letter to GBRAA stating that, “during the past 14 years, [Mont-clair] has operated a number of ten to fifteen day trips to London and/or Paris featuring the Concorde and Queen Elizabeth 2.” Zimmermann enclosed a copy of a recent brochure with the letter. He further stated: “we are interested in the possibility of operating a one-time British Airways or Air France Concorde flight from London to Gulfport on September 18, 2002.”[1] Zimmermann requested that GBRAA reply with a letter or facsimile if it was interested and approved of the proposed flight. Additionally, Zimmermann explained that there must be “a minimum number of participants for the Concorde to fly into Gulfport.” In closing, Zimmer-mann stated that Montclair would “act as *1002 the intermediary between [the GBRAA], British Airways or Air France.”
¶ 3. On December 7, 2001, Spirito sent a letter to Zimmermann “welcoming the opportunity to host the Concorde visit to the Gulfport-Biloxi International Airport.” Spirito requested that Zimmermann contact him at his “earliest convenience to coordinate the sales effort and marketing of this once in a lifetime opportunity.” Spirito testified that, during a conversation with Spirito to follow-up the December 7 letter, Zimmermann stated that ninety-five tickets needed to be sold in order for the Concorde to fly out of GBIA.[2] Spirito further testified that Zimmermann mentioned no other conditions, but that he advised him that Montclair would contact the GBRAA in April of 2002 to begin coordinating the trip.
¶ 4. Regarding the April 2002 communications, Spirito testified that Zimmermann requested that he “rally the local travel agents in the area so that he can distribute his brochure to and keep contact with the travel agents in order to sell” the trip. Spirito further testified that he explained to Zimmermann some of the marketing efforts being made by the GBRAA in order to sell ninety-five seats on the Concorde. Those marketing efforts included newspaper advertisements in various areas, including Baton Rouge, Slidell, New Orleans, Jackson, Hattiesburg, Mobile, Pensacola, and the Mississippi Gulf Coast. According to Spirito, from April 2002 until he learned that the Concorde would not fly out of Gulfport, he had weekly conversations with Zimmermann during which he updated Zimmermann on GBRAA’s advertising campaign. Regarding GBRAA’s willingness to incur advertising expenses, Spirito testified that having the Concorde fly out of GBIA was an economic development and public relations venture. He also intended for the Concorde flight to be a part of GBRAA’s twenty-fifth anniversary celebration, which it was celebrating in the fall of 2002. Spirito testified that he informed Zimmermann that GBRAA expected to benefit from the positive media attention that would be generated from a Concorde flight out of GBIA.
¶ 5. In August of 2002, Spirito was informed by Zimmermann that ninety-five seats on the Concorde had been sold. On August 5, 2002, Zimmermann sent a letter to Spirito expressing Montclair’s satisfaction with the progress of the Gulfport-Biloxi Concorde/Queen Elizabeth 2 promotion, thanking Spirito for his cooperation, and repeating Montclair’s invitation to Spirito and his wife to join the trip as Montclair’s guests. Zimmermann also stated that “we hope we will receive enough upper-end bookings in the time remaining.”
¶ 6. Spirito testified that, after receiving the August 5 letter, he contacted Zimmermann for an explanation of the never-before-mentioned “upper-end” booking requirement. According to Spirito, Zimmermann explained that the Concorde could still fly out of GBIA, but that a certain amount of upper-end bookings on the Queen Elizabeth 2 must be purchased in order for it to do so. Spirito testified that, when asked, Zimmermann could not tell him how many upper-end bookings were needed. The conversation with Zimmermann prompted Spirito to conduct additional investigation.
¶ 7. Spirito contacted British Airways and Air France, and he discovered that Montclair did not have a contract with either company. He also obtained a business report on Montclair from the Better Business Bureau. The report stated that *1003 the Better Business Bureau had received several complaints against Montclair regarding overseas travel packages.[3] Some of the complainants alleged that they felt misled by Montclair’s advertising regarding the Concorde when they discovered that the Concorde had been grounded. When asked by the Better Business Bureau whether Montclair informed its customers that the Concorde had been grounded, Montclair responded that “[o]ur sales staff is instructed to advise clients, if asked, that the Concorde is not flying.”
¶ 8. After conducting his investigation, Spirito concluded that the Concorde would not be available for charter anywhere inside the United States, no matter how many seats were sold. Spirito testified that, since a Concorde’s crash in 2000, the Concorde’s only United States departure was from JFK International' Airport in New York City with service to London, England or Paris, France.[4] When Spirito contacted Zimmermann to inform him of his conclusions, Zimmermann stated that he was unaware that the Concorde would not have been available.[5] On August 28, 2002, Frank Genzer, the Chairman of GBRAA, sent a letter to Zimmermann stating that “[i]t has come to my attention that Montclair Travel does not have a contract with either Air France or British Airways to conduct chartered operations with the Concorde.” Genzer requested that Montclair verify in writing its intentions to accommodate the customers who had paid to fly on the Gulfport-Biloxi Concorde. Genzer also stated that $24,000 had been spent on advertising for the Gulf-port-Biloxi Concorde.
¶ 9. Even though the Concorde was not available for a flight out of GBIA, ninety-three of the ninety-five ticket holders ultimately flew on the Concorde to Europe. The passengers were required to fly on a regular, domestic commercial airline from GBIA to New York City, where they boarded the Concorde. A single Concorde aircraft was unavailable to accommodate all of the passengers on the trip; thus, some passengers flew directly into London, while others flew into Paris, and then took another flight to London.
¶ 10. Spirito testified that GBRAA incurred a total of $30,932.45 in advertising expenses for the Concorde promotion. He further testified that GBRAA would not have undertaken any of those expenses had Montclair disclosed that it did not have a contract with British Airways or Air France. According to Spirito, GBRAA also would not have undertaken any of the advertising expenses had Montclair disclosed that neither British Airways nor Air France had flown the Concorde into any United States city other than New York since July of 2000. Zimmermann testified that Montclair spent a total of $647,931 for promotion of the Gulfport-Biloxi Concorde connection. ' He further testified that Montclair’s total gross receipts amounted *1004 to $807,143. Accordingly, Montclair made a $159, 212 profit from the promotion.
¶ 11. On December 23, 2002, GBRAA filed suit against Montclair and Zimmer-mann, individually and as an agent of Montclair. GBRAA alleged that Montclair was liable for damages on numerous grounds, including: breach of implied or quasi-contract, quantum meruit, unjust enrichment, breach of the duty of good faith and fair dealing, grossly negligent and/or intentional misrepresentations and/or fraud in the inducement, equitable and/or promissory estoppel, and breach of fiduciary duties. The case was tried without a jury by the Harrison County Circuit Court on October 18, 2004. At the close of GBRAA’s case-in-chief, Montclair moved for a directed verdict. The circuit court granted Montclair’s motion. In his ruling from the bench, the judge found that “there are no physical documents or emails which memorialize [an] agreement or impose a duty upon Montclair for the Concorde to physically appear in Gulfport.” The judge also found, although the Concorde was never going to be available, GBRAA failed to prove that Montclair and/or Zimmermann had personal knowledge of that fact. Furthermore, the judge found that the practices of Montclair “could possibly be perceived by the ordinary citizen in any community, much less south Mississippi, as misleading, dubious, untrue, and fraudulent.” Nonetheless, the judge concluded that those practices imposed no legal duty on Montclair. A judgment consistent with this ruling was entered on November 23, 2004. On April 15, 2005, the circuit court denied GBRAA’s motion for a new trial.
¶ 12. From that decision, GBRAA appeals. GBRAA raises the following issues for this Court’s review:
I. Whether the lower court erred in granting Montclair’s motion for directed verdict following the close of GBRAA’s case-in-chief, and Montclair should have been required to put on a defense to the case, since based on the unrebutted evidence presented during GBRAA’s case-in-chief, GBRAA has shown its right to relief by proving the essential elements of each of its claims.
II. Whether the lower court erred in denying GBRAA’s motion for a new trial since, based on the unrebutted evidence in the record, the failure to grant GBRAA a new trial will result in a miscarriage of justice.
STANDARD OF REVIEW
¶ 13. We must first note that, although the circuit court granted Mont-clair’s motion for directed verdict, the appropriate motion in a case tried without a jury is not a motion for directed verdict, but for involuntary dismissal, pursuant to Rule 41(b) of the Mississippi Rules of Civil Procedure. Rule 41(b) provides in relevant part that “[a]fter the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant ... may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.” The standard of review for a motion for involuntary dismissal is different than that for a motion for directed verdict. Stewart v. Merchants Nat’l Bank, 700 So.2d 255, 259 (Miss.1997) (citing Century 21 Deep South Properties, Ltd. v. Corson, 612 So.2d 359, 369 (Miss.1992)). A judge should grant a motion for involuntary dismissal if, after viewing the evidence fairly, rather than in the light most favorable to the plaintiff, the judge would find for the defendant. Id. (emphasis added). “The court must deny a motion to dismiss only if the judge would be obliged to find for the plaintiff if the plain *1005 tiffs evidence were all the evidence offered in the case.” Id. In reviewing a trial court’s grant or denial of a Rule 41(b) motion for involuntary dismissal, we apply the substantial evidence/manifest error standards. Id.
ISSUES AND ANALYSIS
I. Whether the lower court erred in granting Montclair’s motion for directed verdict following the close of GBRAA’s case-in-chief, and Mont-clair should have been required to put on a defense to the case, since based on the unrebutted evidence presented during GBRAA’s case-in-chief, GBRAA has shown its right to relief by proving the essential elements of each of its claims.
II. Whether the lower court erred in denying GBRAA’s motion for a new trial since, based on the unrebutted evidence in the record, the failure to grant GBRAA a new trial will result in a miscarriage of justice.
¶ 14. Before addressing the issues presented by GBRAA, we must note that Montclair has failed to file a brief with this Court. We have long held that an appellee’s failure to file a brief is tantamount to confession of error and will be accepted as such unless the reviewing court can say with confidence, after considering the record and the brief of the appealing party, that there was no error. Varvaris v. Perreault, 813 So.2d 750, 752(¶ 5) (Miss.Ct.App.2001) (citing Dethlefs v. Beau Maison Dev. Corp., 458 So.2d 714, 717 (Miss.1984)). “Automatic reversal is not required where appellee fails to file a brief.” Id. (citing N.E. & R. v. L. H., 761 So.2d 956(¶ 14) (Miss.Ct.App.2000)). In order to merit reversal, “the appellant’s argument ‘should at least create enough doubt in the judiciousness of the trial court’s judgment that this Court cannot say with confidence that the' case should be affirmed.’ ” Id. (citing Selman v. Selman, 722 So.2d 547, 551(¶ 13) (Miss.1998)).
¶ 15. GBRAA asserts that it established a prima facie case of fraudulent/intentional misrepresentations, grossly' negligent/negligent misrepresentations, quasi-contract/quantum meruit/unjust enrichment, promissory estoppel, and equitable estop-pel. According to GBRAA the record shows that Montclair knew or should have known that the Concorde would not be available for a GBIA departure and that Montclair misrepresented that fact. GBRAA further argues that Montclair misrepresented that it was acting as the agent of British Airways and Air France. Moreover, GBRAA asserts that the record is void of any evidence to rebut the conclusion that Montclair was at least negligent, if not grossly negligent, in making the representations that it did to GBRAA.
¶ 16. We find that the record unequivocally shows that Montclair did hold, itself out as an agent of British Airways and Air France, as evidenced by Mont-clair’s brochure for the promotion. The brochure specifically stated that “Mont-clair Travel is acting as agent for British Airways, P.L.C. of London, England; Air France of Paris, France ... the principals in the operation of the trip.” According to Spirito, GBRAA would not have undertaken any of the advertising expenses to promote the trip had Montclair revealed that it did not have a contract with British Airways or Air France to sell seats on a Concorde flight from GBIA.
¶ 17. Regarding GBRAA’s assertion that Montclair knew or should have known about the Concorde’s unavailability, we find that the record supports this assertion. During examination by the court, Zimmermann conceded that he was in a special position to know whether the Con *1006 corde was available. Furthermore, although Zimmermann testified that Mont-clair had “been following the Concorde being put back into service very closely,” he also testified that he did not bother to find out whether the Concorde was resuming flights into cities other than New York City. Particularly relevant to this issue is the circuit court’s finding that the practices of Montclair “could possibly be perceived by the ordinary citizen in any community, much less south Mississippi, as misleading, dubious, untrue, and fraudulent.”
¶ 18. After conducting a thorough review of the record, and after carefully considering GBRAA’s brief and Mont-clair’s lack thereof, we cannot say with confidence that the trial court did not err. Consequently, we find that the trial court committed manifest error in granting the motion for directed verdict, which we view under the standard of review for a motion for involuntary dismissal. Therefore, we reverse and remand this case for a new trial.
¶ 19. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY IS REVERSED AND REMANDED FOR A NEW TRIAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ROBERTS, JJ„ CONCUR.

. The actual date scheduled for the fourteen-day trip was set for October 18, 2002.

. The total capacity of the Concorde was one-hundred passengers.

. Zimmermann testified that, before sending the November 2001 letter to GBRAA, he was aware of complaints against Montclair regarding the advertising of Concorde promotions and the unavailability of the Concorde.

. Zimmermann testified that he was aware of one exception: "on November the 7, of 2001 there was a Concorde charter from London to Washington, D.C. which carried Tony Blair.” Zimmermann conceded that Montclair was not involved in the Tony Blair trip. He further admitted that he did not bother to find out whether the Concorde was resuming flights into cities other than New York City.

.During examination by the court, Zimmer-mann conceded that he was in a special position to know whether the Concorde would fly out of a city in the United States other than New York City. Nonetheless, he testified that he did not know of the Concorde's unavailability.