# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-01174-COA

IN THE MATTER OF THE LAST WILL AND                    APPELLANT
TESTAMENT OF HERMAN BOWLING,
DECEASED: PAULA B. HICKS

v.

MARK S. BOWLING                                        APPELLEE

DATE OF JUDGMENT:             04/16/2013
TRIAL JUDGE:                  HON. C. MICHAEL MALSKI
COURT FROM WHICH APPEALED:    PONTOTOC COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       JOE M. DAVIS
ATTORNEY FOR APPELLEE:        MARK NOLAN HALBERT
NATURE OF THE CASE:           CIVIL - WILLS, TRUSTS, AND ESTATES
TRIAL COURT DISPOSITION:      INVOLUNTARILY DISMISSED
                              APPELLANT'S CLAIMS
DISPOSITION:                  AFFIRMED - 09/09/2014
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., MAXWELL AND JAMES, JJ.**

**MAXWELL, J., FOR THE COURT:**

¶1.    When a case is tried without a jury, the judge may dismiss a plaintiff's claim if the evidence, viewed fairly, did not obligate the judge to find for the plaintiff. Here, Paula Hicks tried her will contest without a jury. And when she finished presenting her evidence, the chancellor dismissed her claim that her brother unduly influenced their father's will.

¶2.    After review of this dismissal, we find the chancellor was right that evidence of a confidential relationship between Paula's brother and father was not enough by itself to raise a presumption of undue influence over the will. Paula also had to show either attendant

suspicious circumstances or that her brother was somehow involved in making his father's will. And Paula showed neither. So we find the will contest was properly dismissed.

¶3. While Paula is correct that a mere confidential relationship *is* enough to raise a presumption of undue influence over inter vivos property transfers between her brother and father, this particular distinction makes no difference for Paula on these facts. Because Paula's father's will left his entire estate to her brother, once the chancellor dismissed her will contest, her request that her brother return certain property to the estate became moot. We thus affirm the dismissal of this claim as well.

## Background Facts and Procedural History

### I. Will Formation

¶4. Paula and her brother, Mark Steve Bowling (Steve), are the only two children of Herman Bowling. When Herman met with attorney Greg Pirkle in April 2010 to draft his will, the ink was still drying on the lawsuit settlement between his two children over their grandmother's estate.

#### A. Paula's Lawsuit

¶5. Paula and Steve's grandmother had died in 2005, leaving everything to her two grandchildren. But before she died, Steve had used his power of attorney to transfer significant amounts of cash to himself and his wife. What would have been an estate worth more than half a million dollars had only $140,000.

¶6. In 2007, Paula sued Steve to set aside the money transfers. Three years later, on the day of trial, the siblings announced a settlement. Paula got everything she had asked for—

2

her attorney's fees, expert-witness fees, and an amount to equal what she would have inherited if Steve had never transferred any funds.

### B. Herman's Will

¶7. Herman had been deposed as a potential witness in Paula's suit. While waiting for his deposition, he had what the chancellor described as a "spontaneous meeting in the [law firm's] waiting room" with Pirkle. While Pirkle had, years before, drafted articles of incorporation for Steve's limited liability company, Pirkle was not handling the litigation between Steve and Paula. When Herman learned that Pirkle specialized in estate planning, Herman told Pirkle he wanted to make a will.

¶8. Herman's first appointment with Pirkle was two days after his children settled their dispute over their grandmother's estate. A neighbor drove Herman to Pirkle's office. In his deposition weeks earlier, Herman had testified that he handed over to Steve $171,000 in cash, "so when I get disabled where I can't go or nothing he'll have something to pay my bills with." And when asked what would happen to that money when he died, Herman testified that his children would halve whatever was left.

¶9. But in Pirkle's office that day, Herman proposed a different idea for his money. He told Pirkle he wanted to disinherit Paula and leave everything to Steve. Herman explained to Pirkle that he was mad at how Paula had handled her dispute with her brother—not only suing him but then refusing to settle for less money. Herman thought Steve had taken good care of his grandmother and had only received from her what he was due. So Herman decided to leave all his property to Steve. The only exception was his house, which he

3

wanted to give to Paula's daughter.

¶10.    Because Herman's stated intention was to exclude one of his children, Pirkle carefully scrutinized Herman and his reasoning. According to Pirkle, Herman appeared competent and sure of what he was doing. So Pirkle had a paralegal prepare a will to that effect, as well as two property deeds. The first deed transferred Herman's house to his granddaughter. The other deed transferred another piece of real property to Steve's LLC.

¶11.    Pirkle testified he had been careful to wall off his estate work for Herman from any other litigation matters his firm was working on for Steve. Pirkle never contacted Steve about working on Herman's estate. And Pirkle instructed his staff to not discuss the will or its contents with anyone. Herman went back to Pirkle's law firm two months later, without any family members, and executed the documents.

### C.    Paula and Herman's Relationship

¶12.    Herman lived for almost two more years after he executed his will. Until the last six months of his life when he moved into Steve's house, Herman lived in a mobile home parked on Steve's property. While in the aftermath of the settlement, Steve had ordered Paula never to come onto his property, Steve apparently allowed Paula to visit their father's home whenever she wanted.

¶13.    Paula testified that her relationship with her father had not changed based on the lawsuit with her brother. But she did admit to the chancellor that Herman had asked her to settle for less, but she refused. She also admitted on cross-examination that, as part of her lawsuit with Steve, she had Steve's assets frozen. Included in these frozen assets was her

4

father's $171,000, which he had placed in Steve's bank account. So from 2008 to the settlement in 2010, Paula's lawsuit kept Herman from accessing or using any of his money. While Paula was adamant that Herman told her in private that *all* of this money would be hers when he died, the chancellor noted this supposed assurance was contradicted by both Herman's will and his earlier deposition testimony that Paula would get half of anything left.

## II. Will Contest

¶14. When Herman died in March 2012, Steve immediately probated the will. Paula quickly responded by filing a complaint to contest. In this complaint, she also requested certain inter vivos transfers from Herman to Steve, his wife, and their LLC be set aside. Neither party asked for a jury trial.[1] So in April 2013, the chancellor conducted a bench trial.

### A. Paula's Evidentiary Burden

¶15. As the will's proponent, Steve presented evidence first. He made a prima facie case by admitting into evidence Herman's will and record of probate. *See In re Estate of Laughter*, 23 So. 3d 1055, 1061 (¶18) (Miss. 2009); *In re Will & Estate of Smith*, 722 So. 2d 606, 611-12 (¶13) (Miss. 1998). Steve also called Pirkle to testify about the will and deeds' creation.

¶16. Then it was Paula's turn to try to overcome Steve's prima facie case. *See id.* Paula's claim was that Steve had exerted undue influence to receive everything under Herman's will.

---

[1] By statute, either party to a will contest has an automatic right to a jury trial *if requested*. Miss. Code Ann. § 91-7-19 (Rev. 2013); *see also In re Will and Estate of Varvaris,* 477 So. 2d 273, 277-78 (Miss. 1985).

"From its very nature, . . . [u]ndue influence is an intangible thing, which only rarely is susceptible of direct or positive proof." *Croft v. Adler*, 237 Miss. 713, 727, 115 So. 2d 683, 688 (1959). A presumption of undue influence arises when a contestant like Paula shows the testator and beneficiary were in a confidential relationship and that relationship was coupled with suspicious circumstances—such as the testator's mental infirmity—or the beneficiaries' participation in the will's preparation or execution. *Id.* at 723-24, 115 So. 2d at 686. Had Paula been able to make such a showing, the burden would have shifted back to Steve to show by clear and convincing evidence his inheriting everything under the will was not a product of undue influence. *See Wright v. Roberts*, 797 So. 2d 992, 999 (¶¶21, 23) (Miss. 2001).

¶17. But when Paula finished offering her evidence, the chancellor agreed with Steve that Paula had failed to establish a presumption of undue influence. So the chancellor granted Steve's Rule 41(b) motion to dismiss Paula's complaint. *See* M.R.C.P. 41(b).

### B. Dismissal Under Rule 41(b)

¶18. In contrast to a motion for a directed verdict under Mississippi Rule of Civil Procedure 50(a), which applies to jury trials and requires the trial judge to view the evidence in the light most favorable to the plaintiff, a Rule 41(b) motion to dismiss differs somewhat. It applies to cases tried by a judge sitting without a jury and requires the judge to view the evidence *fairly*. *Gulfport-Biloxi Reg'l Airport Auth. v. Montclair Travel Agency, Inc.,* 937 So. 2d 1000, 1004 (¶13) (Miss. Ct. App. 2006) (contrasting Rule 41(b) with Rule 50(a)). When considering a Rule 41(b) motion to dismiss, the judge must deny the motion to dismiss

6

"only if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case." *Id.* at 1004-05 (¶13) (quoting *Stewart v. Merchs. Nat'l Bank*, 700 So. 2d 255, 259 (Miss. 1997)).

¶19.    Here, the chancellor viewed the evidence more than fairly toward Paula. In his order dismissing her complaint, he stated he had viewed her evidence in the light most favorable to her. But even in this favorable light, the chancellor held he was not obliged to find for her. While Paula's evidence established Steve and her father were in a confidential relationship, this relationship was "not in itself sufficient to raise a presumption of undue influence." *Estate of Laughter*, 23 So. 3d at 1064 (¶37). According to the chancellor, there had been no challenge to Herman's mental capacity. There was also no evidence "Steve was in any way involved in the preparation of the will or abused his relationship with his father," nor any suspicious circumstances surrounding the will's formation.

¶20.    The chancellor also noted that, even if Paula's evidence had been sufficient to raise a presumption of undue influence, Steve would have overcome the presumption through the evidence he had presented first—evidence which clearly and convincingly showed he had acted in good faith. This included evidence of his father's full knowledge and deliberation of his actions and consequences and his independent consent and action. *See Wright*, 797 So. 2d at 999 (¶23). So the chancellor dismissed Paula's entire complaint, which included both the petition to contest the will and the request to set aside the inter vivos transfers.

¶21.    After an unsuccessful post-trial motion, Paula timely appealed. We review Rule 41(b) dismissals under the deferential substantial-evidence / manifest-error standard. *Id.* Under

7

this standard, we must affirm unless the chancellor applied an incorrect legal standard or made manifestly wrong or clearly erroneous factual findings. *Estate ex rel. Campbell v. Calhoun Health Servs.*, 66 So. 3d 129, 133 (¶14) (Miss. 2011).

**Discussion**

¶22. On appeal, Paula insists we must first consider whether the chancellor applied the wrong legal standard to her request to set aside the inter vivos transfers. But if Paula's will contest was properly dismissed, then the validity of the inter vivos transfers is moot. This is so because the will left the *entire estate*—real and personal, tangible or intangible—to Steve.[2] Thus, even if, based on Paula's evidence, the chancellor was obliged to find Steve had to return the property to the estate, which he was not, the practical result would be the same—Steve still gets to keep the property under the will. So we start with the dispositive issue—whether the chancellor properly dismissed the will contest.

### I. Will Contest

¶23. Paula maintains the chancellor bungled the evidentiary burdens in a will contest. As she sees it, the chancellor ended her claim prematurely by not finding the nature of Steve and Herman's confidential relationship raised a presumption of undue influence. She insists a mere finding of a confidential relationship should have shifted the burden back to Steve to disprove the presumption. She also suggests the chancellor—in alternately holding any

---

[2] The only exceptions were items of personal property listed on a separate hand-written sheet, which were to be bequeathed according to that document. If such a document exists, it was not made part of the record. And Paula makes no claim that the allegedly improper inter vivos transfers involve property on that list.

presumption of undue influence had in fact been disproved—wrongly saddled her with the burden of proving Steve acted in bad faith or participated in the will, instead of requiring Steve to exonerate himself.

### A. When the Presumption of Undue Influence Arises

¶24. Citing the will-contest case *Harris v. Sellers*, 446 So. 2d 1012, 1014 (Miss. 1984), Paula argues her evidence that Steve and her father were in a confidential relationship was enough to raise the presumption of undue influence, shifting the burden of proof back to Steve. While at first blush Paula seems right, a closer look at Mississippi law supports the chancellor's finding of what is really required for undue influence to be presumed.

¶25. Paula is correct that in *Harris* the supreme court did say, "Under the case law of our state, the existence of a confidential or fiduciary relationship gives rise to a presumption of undue influence." *Id.* But it is very obvious from *Croft*—the case on which the *Harris* court relied—and several later supreme court cases that this is not what the *Harris* court meant.

¶26. In *Croft*, the supreme court emphasized that "the mere existence of confidential relations between a testator and a beneficiary under his will *does not* raise a presumption that the beneficiary exercised undue influence over the testator, as it does with gifts inter vivos[.]" *Croft*, 237 Miss. at 723-24, 115 So. 2d at 686 (emphasis added). Instead, "such consequence follows where the beneficiary has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstances, such as mental infirmity of the testator; or where the beneficiary in the confidential relation was active directly in preparing the will or procuring its execution, and

9

obtained under it a substantial benefit." *Id.*

¶27.    Fifty years later, our supreme court again maintained this principle with equal clarity—"The mere existence of a confidential relationship . . . is not in itself sufficient to raise a presumption of undue influence." *Estate of Laughter*, 23 So. 3d at 1064 (¶37). Rather, "[s]uch a presumption would arise only in certain circumstances"—the same circumstances listed in *Croft*. *Id.* (citing *Croft*, 237 Miss. at 723-24, 115 So. 2d at 686).

> B.    *The Findings*

¶28.    The chancellor here found Paula could show nothing else besides the confidential relationship between Herman and Steve. He found Steve did not actively participate in either procuring or preparing the will. And there were no suspicious circumstances surrounding the creation of the will. The chancellor supported his finding with credible evidence— namely the attorney Pirkle's testimony.

¶29.    Pirkle testified that Herman had initiated the appointment to make a will and had dictated all its terms. This was done without any influence from Steve. Because Herman's intent was to disinherit one of his children, Pirkle carefully probed to ensure Herman knew what he was doing. Pirkle did not contact Steve about the will or its contents. And since Steve's litigation with Paula was considered an open matter with his firm, Pirkle and his staff had been careful to "wall off" Herman's estate work. Finally, Pirkle testified that when Herman came in to execute the will, no other family members were present, and Pirkle was satisfied that Herman was carrying out his own wishes. After review, we see no manifest error in the chancellor's finding Steve was not involved in any part of the process.

10

¶30. The chancellor also found Steve did not abuse his relationship with his father. In her brief, Paula asserts that Steve isolated her from her father at the time he executed his will. But at trial, the chancellor carefully explored this allegation. When pointedly asked, Paula clarified that her brother allowed her onto the property to visit her father. And her visits only stopped when Herman moved into Steve's house six months before his death—a year and a half *after* Herman had executed his will.

¶31. Paula also claims Steve "has a history of abusing positions of trust in regards to the elderly"—presumably a reference to Steve's handling of their grandmother's estate. But Paula points to no record evidence showing Steve abused his position of trust with their father. In his 2010 deposition, Herman testified he had full faith in Steve, which is why he placed his $171,000 in Steve's bank account. And at trial, Paula testified that, to her knowledge, Steve had never taken advantage of their father—financially or otherwise.

¶32. Our review shows the chancellor applied the correct legal standard and supported his factual findings with credible evidence. There is no manifest error in the chancellor's finding that the presumption of undue influence did not arise. Thus, we find Paula was unable to meet her burden of proof. *See Estate of Laughter*, 23 So. 3d at 1061 (¶18); *Estate of Smith*, 722 So. 2d at 611-12 (¶18).

### C. *When the Presumption of Undue Influence Is Disproved*

¶33. In his opinion, the chancellor also held, "[e]ven if the presumption of undue influence had been proven, it would have been overcome by clear and convincing evidence[.]" He reached this alternative finding because "[t]here was no proof that Steve acted improperly,

11

that [Herman] lacked knowledge of his actions and their consequences, or that his actions were not independent." *See Murray v. Laird*, 446 So. 2d 575, 578-79 (Miss. 1984). Paula interprets this portion of the order as an "improper shift" in the burden of proof. She views herself as being penalized for not proving Steve unduly influenced her father. She urges that Steve should have been required to respond with additional evidence that he did not unduly influence their father.

¶34. According to Paula, if the presumption of undue influence had arisen, it was error to dismiss her will contest after she rested. She instead insists that to meet his burden of clear and convincing evidence, Steve should have been required to put on additional evidence. *See Wright*, 797 So. 2d at 999 (¶23). But Paula is mistaken. What she overlooks is that this was not a traditional lawsuit where she, as the one who filed the complaint, goes first to make her prima facie case. This was a will contest. As such, Steve, as the will's proponent, was the first to put on evidence. And instead of presenting a bare bones prima facie case—the will and record of probate—Steve opted to go ahead and call Pirkle to testify. So even if the burden had shifted back to Steve, the already-presented evidence was more than sufficient for the chancellor to have found Steve clearly and convincingly proved that he had acted in good faith and that his father had known what he was doing and had exhibited independent consent and action. *See id.*

¶35. For this reason, after Paula rested her case, the chancellor was not obligated to find in her favor. We affirm the order dismissing the will contest under Rule 41(b).

## II. *Inter Vivos Transfers*

12

¶36. As the will left Herman's entire estate to Steve, Paula's request that Steve return certain property to the estate became moot when the chancellor dismissed the will contest. But it is still worth clarifying that Paula *did* have sufficient evidence to raise the presumption of undue influence on the inter vivos transfers.

¶37. Unlike a will contest, if an inter vivos transfer is challenged, once it is established that the grantor and grantee were in a confidential relationship, no additional proof is needed to raise the presumption of undue influence. *Wright*, 797 So. 2d at 998 (¶21). For the inter vivos transfers, Paula's evidence that Steve and Herman were in a confidential relationship was enough to shift the burden to Steve to prove by clear and convincing evidence that he had acted in good faith, his father had full knowledge and deliberation of his actions and their consequences, and Herman's independent consent and action. *See id.* at (¶23). But as discussed in the previous section, Steve met this burden through Pirkle's testimony, which Steve had already offered before Paula presented her evidence. There was simply no reason to require Steve to recall Pirkle to rehash his earlier testimony.

¶38. Therefore, we find the chancellor's dismissal of this claim was also proper.

¶39. **THE JUDGMENT OF THE PONTOTOC COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**