# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-01112-COA

**MATTHEW J. SIEVERS**                                                                    **APPELLANT**

**v.**

**RENEE FAUCHEAUX-SIEVERS**                                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 08/08/2024 |
| TRIAL JUDGE: | HON. JENNIFER T. SCHLOEGEL |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | DONALD RAFFERTY |
| | BLAKE THORNBRO |
| ATTORNEY FOR APPELLEE: | HERBERT WAYNE WILSON II |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 03/31/2026 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND LASSITTER ST. PÉ, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Matthew Sievers and Renee Faucheaux-Sievers were married in 2015 but separated in 2020; a final divorce decree was entered in 2022. Renee had been granted a domestic abuse protection order (DAPO) against Matthew in 2021, and in 2024, when her DAPO was set to expire, Renee requested a new DAPO. After a hearing, the chancellor issued a new DAPO for Renee. Matthew now appeals. Finding no error or abuse of discretion on the chancellor's part, this Court affirms.

## FACTUAL AND PROCEDURAL HISTORY

¶2.     Matthew and Renee were married in September 2015. The couple separated on September 25, 2020, and a final divorce decree was entered on September 13, 2022.

¶3. On May 13, 2021, Renee filed a petition for a DAPO against Matthew in the Hancock County Chancery Court. On the same day, the Hancock County Justice Court issued a temporary DAPO. On June 10, 2021, the chancery court entered a DAPO set to expire on June 10, 2024. The record indicates that Matthew was charged with violating a protective order and three counts of simple assault on April 23, 2021. On June 30, 2021, in the Municipal Court of the City of Waveland, a conditional bail order was entered.[1] On August 28, 2023, the County Court of Hancock County entered a judgment explaining that after a trial, Matthew was found guilty of knowingly violating a protective order. A later judgment, dated January 5, 2024, indicated that Matthew pled guilty to one count of simple assault and that the other two assault charges had been "remanded to the files."

¶4. On May 20, 2024, Renee filed another DAPO petition, requesting an extension because the current order was about to expire. On June 4, 2024, the chancery court conducted a hearing on Renee's petition. Matthew requested a continuance, so the chancellor issued an emergency DAPO to Renee, set to expire on August 8, 2024.

¶5. On that date, the chancery court conducted a hearing on the petition. Renee provided the trial court with several documents concerning Matthew's past behavior; the court admitted two of those documents under Mississippi Rule of Evidence 405.[2] The remainder of those documents were held inadmissible. Renee alleged that Matthew had violated the

---

[1] This order refers to four assault charges but all other mentions in the record reflect three charges.

[2] This rule will be discussed in further detail *infra*.

DAPOs from both 2020 and 2021.

¶6.　　Renee stated that on September 11, 2020, Matthew "held [her] hostage in [her] house[.]" She "signed papers for him to be arrested for holding a gun to [her] head[.]" She further stated:

> Between 2021 and today, Mr. Sievers entered the town that I live in several times. He taunted me. . . . He had his attorneys, through divorce, putting up false allegations about me, about my character. . . . He ruined my character in my town. . . . Mr. Sievers caused permanent damage to my wrist, to my body from poisoning.[3] He also caused permanent damage to my knee . . . and he has threatened my life on numerous occasions. . . . I have been with him. I've asked psychiatrists to help me to get him out of my house. . . . I was at this session where he does say that he has frequent outbursts against me. . . . **I fear for my life**. . . . **I am afraid that this man will kill me**. . . . He's been violent with me in the past, and I - - and he violated protective orders[.]

(Emphasis added).  Renee also alleged Matthew had "harass[ed her] through litigation."[4] Renee provided the court with a report detailing Matthew's discussion with his neuropsychologist about these "outbursts."  The chancellor denied admission of that report.

¶7.　　Renee also offered records concerning "a partial hospitalization, into an intensive outpatient program," which Matthew left in Renee's home.  Renee described the documents as follows:

> This is from June 8, 2020. [Matthew] is describing violence other than self defense; the uncontrolled rage that leads to destroying property in our beautiful

---

[3] The chancellor admitted and reviewed Renee's medical records from 2021 to 2023 concerning arsenic in her system.  Matthew's counsel argued through cross-examination that the arsenic levels were due to Renee's smoking rather than any deliberate poisoning.

[4] On cross-examination, Renee agreed that she "started" the litigation by filing for divorce and subsequent DAPOs.

home, which is my beautiful home; and some other captions from just his state of mind, that it's more than depression.

Matthew's attorney objected to the admission of those documents on the basis of relevance, and the chancellor overruled his objection, admitting the documents into evidence. The court also admitted a police report confirming that Matthew was in town at a certain time she alleged seeing him.

¶8. Particularly of note, Renee testified that she had not had contact with Matthew (other than in a courthouse) since 2021. However, she alleged that she had seen Matthew in locations such as the gas station near her house and, on one instance, outside the courthouse giving her a "grimacing" look.

¶9. Matthew moved for a directed verdict at the conclusion of Renee's testimony, arguing that she had stated twice "that there have not been any contacts, physical threats, anything like that, within the last three years." The chancellor denied the motion and found "sufficient acts that ha[d] occurred in the last three years to give her a reasonable fear[.]" Further, the chancellor noted that those events of the past three years were "still relevant" and were not "taken in a vacuum." Rather, those events were "coupled with everything else that ha[d] happened prior[.]"

¶10. Matthew also testified. He stated that his job with the United States military required security clearance, and he had passed a background check to receive it in 2023.[5] He also

_____

[5] This fact appeared to insinuate that he would not have passed a background check if the domestic violence allegations had been true.

stated that his trips from Louisiana (his new residence) to Mississippi were only for meeting with his attorneys. Further, Matthew argued that Renee's story about him waiting outside of the courthouse for her was not true; he was "waiting for the car to cool off and making some phone calls[.]" He drove away "slowly" once he saw Renee exiting the courthouse.

¶11. Matthew testified that he was not convicted of any of the domestic abuse allegations against him beginning in 1996. A specific charge in 2000 was dismissed after the victim recanted her story. Matthew also addressed the allegations from Renee's testimony and stated that they all were either untrue or taken out of context. He emphasized that he never pointed a gun at Renee.

¶12. In particular, he addressed the recent charge of domestic violence involving Renee. He argued that just before, she had hit him with a beer bottle from across a table, and he "reflectively [sic] . . . swipe[d] the plate" in front of him, which "inadvertently, apparently," caused Renee to get hit by a salt shaker. He did not know Renee had been hurt until the charges were filed later. Matthew contended that he only entered a guilty plea to avoid the possibility of jail time.

¶13. On cross-examination, Matthew testified that he had been married five times, had "no idea" how many times he had been charged with domestic violence, and that it had all been "expunged." He also admitted to hitting his thirteen-year-old "ex-stepdaughter" once when she "skipp[ed] school." The chancellor admitted approximately seven screenshots of text

5

messages between Matthew and Renee.[6]  Renee alleged that Matthew apologized for his actions in those messages.

¶14.    At the conclusion of the hearing, the chancellor made her final ruling.  In pertinent part, she explained:

> I will find that [Matthew]'s testimony was successfully impeached, and that his testimony was not credible on several points. . . .The matter brought before me was a petition for a final domestic abuse protection order, and so I did ask, specifically, what happened between 2021 and today, the time period between the last protective order to today, only because I thought that that was relevant information. . . . **Anything prior to 2021 is also relevant for the [c]ourt to enter a domestic abuse protection order, and the [c]ourt is not limited today in looking at evidence that precedes 2021**. . . .
>
> I do find that, based upon all the previous history between these parties and all the other criminal records of [Matthew], that [Renee] is found to be - - **it's reasonable that she would harbor a fear of abuse** from [Matthew]. There was **violence between them in the past**, among many other things, include holding a gun to her head and hitting her with a beer bottle and a saltshaker, threatening her.
>
> The fact that she was treated for high levels of arsenic in her system, she brought forth **medical records** on that showing it was being investigated. This is, obviously, not conclusive[] . . . but **it does corroborate her belief and her accusation that he had poisoned her in some way**. In other words . . . it is not irrational for her to put that forth that accusation considering the medical evidence involved. It is **not just simply a figment of her imagination**. . . .
>
> [T]here may be no new threats that have been made since 2021, and the [c]ourt is not necessarily finding that there has not been, but even if there has not been, **the whole reason why [Matthew] has restrained himself is because there has been a restraining order**, and so the [c]ourt finds that it is in the

---

[6] Matthew's counsel objected to a majority of these exhibits because they contained no date stamp to indicate when the messages were exchanged.  That objection was overruled.

best interest of [Renee] and for her safety to enter this domestic violence protection order and will do for the allowed statutory period of three years.

(Emphasis added). A final DAPO was issued and set to expire on August 8, 2027.

¶15. On August 19, 2024, Matthew filed a motion to set aside the recently issued DAPO. The chancellor held a hearing on that motion on August 28, 2024. Matthew's counsel argued that they "did not have an opportunity to review beforehand" the exhibits Renee entered at the last hearing and that "a limited amount of information [was] in a lot of the exhibits." He also claimed that he had newly discovered evidence to present:

COUNSEL: [T]here was a lot made to do of an arsenic investigation, an arsenic poisoning investigation.

CHANCELLOR: Yes, I mean, that was in the original petition, so you had notice that that was going to be an issue. Yes.

COUNSEL: Your Honor, we didn't know until she testified who that was reported to. We've, you know, spoken to various agencies, and there was no way of knowing what it was that we could find on it. I now have documentation from the investigator that that is closed. There was no - - they haven't gone forward with the investigation at all. As well as a lot of - - she produced a lot of expunged reports, but with no real explanation of what was being expunged. I do have some documentation that Mr. Sievers was not found guilty in those. They were just expunging arrests, and that was stuff that we didn't know we needed prior to the hearing.

CHANCELLOR: I'm going to . . . deny your motion to introduce new evidence. **These things were available to you at that time**, and you were given a chance for rebuttal as well, also, at the close of the trial.

(Emphasis added).

7

¶16. At the conclusion of the hearing, the chancellor stated that she had previously determined that "all the allegations that [Renee] made against [Matthew] that involved herself were credible," and the remoteness of those allegations was irrelevant, as Renee "established a reasonable fear" of Matthew. Overall, the chancellor found "that the protection orders that were in place prior to this one did have a deterrent effect, and the [c]ourt is going to leave it in place[.]" On September 16, 2024, the chancellor entered an order formally denying the motion to set aside the DAPO. Matthew appealed on September 26, 2024.

## DISCUSSION

¶17. Matthew alleges the chancellor erred by admitting evidence of his criminal history and documents protected by the psychotherapist-patient privilege. He also argues that the chancellor erred by denying "newly discovered evidence" at the hearing of his motion to set aside and that his motions for a directed verdict were denied in error.

¶18. "This Court has a **limited** standard of review in domestic-relations cases[.]" *Hearn v. Hearn*, 191 So. 3d 129, 132 (¶10) (Miss. Ct. App. 2016) (emphasis added) (quoting *In re Dissolution of Marriage of Wood*, 35 So. 3d 507, 512 (¶8) (Miss. 2010)). In other words, "[w]here substantial credible evidence supports a chancellor's findings, we decline to reverse unless the chancellor abused [her] discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Stacy v. Stacy*, 393 So. 3d 1133, 1137-38 (¶12) (Miss. Ct. App. 2024) (quoting *Hardin v. Hardin*, 335 So. 3d 1088, 1092 (¶12) (Miss. Ct. App.

8

2022)).

¶19.	Matthew first claims that any sort of evidence concerning his prior acts was inadmissible.  But these prior acts were all either directly or adjacently tied to domestic abuse.  The chancellor cited Rule 405 and allowed the evidence after finding "that this man's character is, in part, an essential part of the claim that is being made against him in that he . . . has a violent character or nature[.]"

¶20.	The chancellor relied on Rule 405 of the Mississippi Rules of Evidence, which provides in part:

> When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct.

MRE 405(b).  The "essential element" here was violence as a "character trait" demonstrated by violence inflicted upon persons Matthew had been close to in the past.  Matthew was also given the opportunity to discuss and/or rebut these documents once he began testifying.  This Court does not find any manifest error in the chancellor's decision to admit the evidence.

¶21.	Matthew then claims that the chancellor erred by allowing evidence protected by the psychotherapist-patient privilege.  This argument lacks merit for two key reasons.  For one, the chancellor denied admission of the documents that Matthew objected to that were covered by the psychotherapist-patient privilege.  The only objection made by Matthew's counsel at the hearing concerning the documents that were eventually admitted pertained to relevance, not privilege.  "Issues not raised in the ruling court are waived on appeal." *Brown*

*v. Blue Cane Cowart Tippo Water Ass'n Inc.*, 309 So. 3d 478, 486 (¶30) (Miss. Ct. App. 2019) (citing *In re B.A.H.*, 225 So. 3d 1220, 1239 (¶19) (Miss. Ct. App. 2016)).

¶22.    Even if the argument was not waived, "[a] general waiver of the privilege occurs where the patient clearly intends it generally waived, or where the waiver is such that the patient **can no longer reasonably expect the communication to remain confidential**." *Roman Cath. Diocese of Jackson v. Morrison*, 905 So. 2d 1213, 1244 (¶110) (Miss. 2005) (emphasis added).    The records concerning his "partial hospitalization" were "left in [Renee's] home."  Leaving records in the home of someone you separated from like this is an act contrary to any reasonable protection of confidentiality. *See Williamson v. Edmonds*, 880 So. 2d 310, 320 (¶29) (Miss. 2004) (stating "Miss. R. Evid. 503(a)(4) defines a communication as confidential only where it is not intended to be disclosed to third persons").

¶23.    Matthew also claims that he had "newly discovered evidence" at the hearing for his motion for reconsideration and setting aside the DAPO.  This terminology implicates Rule 59 of the Mississippi Rules of Civil Procedure, which only applies to parties seeking a new trial.  This is clearly not the course of action Matthew was pursuing.  Notwithstanding that fact, "newly discovered evidence is that which could not have been discovered by the exercise of due diligence either before or at the time of trial." *In re Hill*, 460 So. 2d 792, 797 (Miss. 1984) (citing *Lang v. State*, 230 Miss. 147, 92 So. 2d 670 (1957)). Matthew's alleged new evidence included a rebuttal of Renee's arsenic-poisoning allegation, which was

10

addressed in the initial hearing. The chancellor denied Matthew's argument, stating the arsenic-poisoning claim "was in the original petition, so you had notice[.]" Additionally, all of the rebuttal information now being offered was available at the time of the bench trial, and Matthew had the capability to gather that evidence. Following a review of the record, we agree with the chancellor's position and see no manifest error.

¶24. The legal standard and process for issuing DAPOs is clear. "Before a temporary or final domestic abuse protection order may be entered, the respondent is entitled to notice of a hearing and an opportunity to be heard." *Waite v. Adkisson*, 282 So. 3d 744, 746 (¶5) (Miss. Ct. App. 2019) (citing Miss. Code Ann. § 93-21-15(1)(a), (2)(a) (Supp. 2017)). "After a hearing, if the chancery or county court finds that the **petitioner has proved the existence of abuse by a preponderance of the evidence**, the court may grant a final domestic abuse protection order to bring about a cessation of abuse of the petitioner[.]" *Id.* (emphasis added) (internal quotation marks omitted). The record indicates that the chancellor applied this very standard.

¶25. Renee testified about past events and her related concerns, and Matthew was permitted to testify in rebuttal of those assertions immediately following. Through Renee's testimony, the chancellor found by a preponderance of the evidence enough to support her allegations of abuse. It is well-settled that a "chancellor, by [her] presence in the courtroom, is best equipped to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those

11

witnesses." *Mabus v. Mabus*, 890 So. 2d 806, 819 (¶56) (Miss. 2003) (quoting *Rogers v. Morin*, 791 So. 2d 815, 826 (¶39) (Miss. 2001)). We do not review this record to determine whether this Court thinks Renee was abused. We review the record to determine whether there was substantial evidence to support the chancellor's **discretion** in determining that Renee was abused. Renee provided substantial testimony to support the determination of abuse. This Court finds no abuse of discretion or manifest error on the part of the chancellor.

¶26. Finally, we address Matthew's argument that his motions for a directed verdict and JNOV were denied in error. "[D]irected verdicts are reserved only for jury trials[,]" and "the proper motion to make at the close of plaintiff's case-in-chief [in a bench trial] is a motion for involuntary dismissal[.]" *Kleyle v. Deogracias*, 330 So. 3d 401, 404 (¶11) (Miss. Ct. App. 2021) (quoting *Ladner v. Stone County*, 938 So. 2d 270, 273 (¶9) (Miss. Ct. App. 2006)). However, our precedent directs: "[R]ather than reversing a trial court's judgment granting a directed verdict due to a procedural error, this Court has considered such appeals under the standard of review for a motion for involuntary dismissal." *Vermillion v. Perkett*, 281 So. 3d 925, 929 (¶12) (Miss. Ct. App. 2019) (citing *Gulfport-Biloxi Reg'l Airport Auth. v. Montclair Travel Agency Inc.*, 937 So. 2d 1000, 1006 (¶18) (Miss. Ct. App. 2006)).

¶27. Our appellate courts utilize "a **more deferential standard of review** when considering involuntary dismissals at a bench trial than when reviewing grants of directed verdicts at a jury trial." *Id.* (emphasis added) (quotation mark omitted) (quoting *All Types Truck Sales Inc. v. Carter & Mullings Inc.*, 178 So. 3d 755, 758 (¶13) (Miss. Ct. App. 2012)).

12

In a bench trial, "[a] judge should grant a motion for involuntary dismissal if, **after viewing the evidence fairly**, rather than in the light most favorable to the plaintiff, the judge would find for the defendant." *All Types Truck Sales Inc.*, 178 So. 3d at 758 (¶13) (emphasis added) (quoting *Gulfport-Biloxi Reg'l Airport Auth.*, 937 So. 2d at 1004 (¶13)). Put differently, "[t]he court must deny a motion to dismiss **only if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case**." *Id.* (emphasis added).

¶28. Here, Renee testified that she feared for her life and that Matthew was going to kill her, and she detailed specific instances of abuse. She testified to seeing Matthew at places "that [she] would frequent," including the gas station near her home. Renee detailed an instance where Matthew was lurking in the courthouse parking lot "very near [her] vehicle" and "star[ing,]" giving her a "grimacing" look. She provided medical records to support her allegations that Matthew was poisoning her. She also provided text messages they exchanged to support her allegations of abuse. Renee also stated that Matthew had "held [her] hostage" in her own home and put a gun to her head.

¶29. Matthew testified and provided his own explanations for the behavior Renee described. He stated that the injury Renee was referring to him inflicting only happened because she threw a beer bottle at him first, and he reacted reflexively. He contended that Renee only had arsenic in her system because she smoked cigarettes. Matthew also admitted to hitting his "ex-stepdaughter" for skipping school, and he had "no idea" how many times

13

he had been charged with domestic violence.

¶30. Reviewing this issue as one of involuntary dismissal rather than a directed verdict requires that we look at the evidence of both parties fairly, showing no favor to any one party in particular. In so doing, this Court does not find that the chancellor should have dismissed Renee's DAPO petition. If the chancellor had only viewed Renee's evidence, she certainly could have found in Renee's favor, and Matthew did not provide enough evidence to warrant a dismissal. This argument is without merit.

## CONCLUSION

¶31. This Court does not find an abuse of discretion concerning the chancellor's final DAPO and does not find Matthew was entitled to an involuntary dismissal. We affirm the decisions of the chancellor.

¶32. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**