# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01468-COA

JOHN POISSO JR.                                                         APPELLANT

v.

DEBORAH POISSO                                                       APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/19/2018 |
| TRIAL JUDGE: | HON. JERRY G. MASON |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JOHN R. REEVES JAMES A. WILLIAMS |
| ATTORNEYS FOR APPELLEE: | ELIZABETH R. DARSEY EARL P. JORDAN JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 06/30/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND C. WILSON, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1. John Poisso Jr. appeals from the judgment of the Chancery Court of Lauderdale County, which granted Deborah Poisso a divorce and divided their marital property that consisted of numerous rental properties and other real estate. The sole issue on appeal is the marital-property distribution. Specifically, John argues the chancery court erred in awarding Deborah the following marital property: possession of "the Poisso Country Store," most of the parties' rental property, and 120 acres of timber property located near Meridian, Mississippi. John also claims he is entitled to excess funds from a 210-acre parcel foreclosure. Finding no error, we affirm the chancery court's judgment.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶2. In April 1994, Deborah and John were married in Lauderdale County, Mississippi. The parties separated in February 2010. No children were born of the marriage, but both parties have children from previous relationships. At the time of the trial, John was sixty years old, and Deborah was fifty-four years old. Over the course of the marriage, the parties engaged in several money-making ventures and accumulated significant assets—they operated a country store and acquired numerous parcels of real property outside Meridian, Mississippi, on which they placed rental houses.

¶3. Deborah has taken courses at a community college, but she never received a degree. John completed the sixth grade and cannot read or write well but testified that he had "[a]ll kinds of skills" at making money. He has "fur trapped," hauled paper wood, "built stuff," and had "store business" experience. In 1997 and 1998, Deborah leased an Amoco convenience store from her father, and the business was lucrative. Deborah also owned a bar on Center Hill Road. She leased it to John before they were married. Both parties worked at the bar, and John continued to manage the bar for a few years after they married.

¶4. Both parties owned several parcels of property before their marriage. In addition to a 14.2-acre parcel on Causeyville Road, which had a house and the bar, Deborah also owned one acre with a house on Long Creek Road. John owned several parcels of timber property in Newton County, totaling approximately twenty-two acres. Further, John owned forty acres located at 2051-A Old Wire Road in Meridian, Mississippi, which he claimed to have inherited from his father. On the acreage was an old two-bedroom log cabin/camp house,

2

which became the marital home, a cedar rental house, and a trailer.

¶5.    In 1997, John and Deborah opened the Poisso Country Store and continued its operation until they separated in 2010. The chancery court found that the store was a substantial source of marital income. The store is located on "Sixteenth Section" land, which the Poissos leased from the Lauderdale County Board of Education. In order to open the store, Deborah testified she contributed $58,000 from the lease of her Amoco convenience store, and she was primarily responsible for its management. She testified that John did not contribute anything to commence operation of the store. John testified that Deborah contributed $50,000 and that he reimbursed her $37,000 for the store. John testified he never saw any profit from the store and received no proceeds. John claimed to spend a substantial amount of time working at the store, usually arriving in the afternoon at 1:00 p.m. after trapping. Deborah primarily managed the store and worked daily from 6:00 a.m. to 9:00 p.m. six days per week. Deborah testified the store generated $40,000 to $80,000 per month in profit.

¶6.    In 1999, the parties began renovating the marital home by adding three bedrooms and a bathroom. The parties were living in this home when they separated; John then moved into the store. In 2001, John purchased eighty acres in Newton County from his sister for fox pens. In July 2002, John purchased twenty acres in Grant Parish, Louisiana, at a sheriff's sale for $42,000. Two houses were located on the property—one being a rental house. John remodeled the home and sold it for $78,000.

¶7.    In May 2002, John bought a 210-acre parcel in Lauderdale County. Testimony about

3

the acquisition of the property is disputed. John claimed Deborah did not want to put her money into this purchase and told John to borrow the funds. Contrarily, Deborah testified that they both wanted the property. John testified he bought the property for $351,000 through a loan from Great Southern National Bank. John clear-cut 100 acres of timber and thinned other timber. With these proceeds, he paid over $300,000 on the note. Four years later, he thinned more timber and paid the balance of the note. He testified he took $16,000 he inherited from his father and "planted the 100 acres back in." Deborah agreed that the timber was cut and that the balance of the note was paid. However, she testified that a down payment for the acreage was from funds generated by the store. She also testified that the bank loan was for $365,000.

¶8. In October 2012, John conveyed the 210-acre parcel to his son Jonathan, in violation of certain agreed orders from June and July 2010. John testified his son used the land to obtain a $65,000 loan from BankPlus for John to pay $15,000 toward Deborah's alimony arrearage so John could be released from the county jail, where he was being held for being in contempt of court. John also needed to pay off a balloon note at Great Southern to prevent foreclosure on the Whitaker Road rental properties. John paid the alimony arrearage; but ultimately John and Jonathan failed to pay the BankPlus loan, and the bank foreclosed on the deed of trust. BankPlus eventually sold the 210-acre parcel for $25,323.26 more than the amount due upon the note. This figure was deposited into the chancery court's registry. Both Deborah and Jonathan requested it.

¶9. At the time of the separation, the parties had thirty-six rental properties, mostly

consisting of cedar houses that John had built and mobile homes. John obtained the cedar in Mississippi and Louisiana, and he built the houses one at a time. Each house took about two and one-half weeks to build, and he built all the cedar houses in about two years. John testified that each cedar house cost approximately $25,000 to $27,000 to build. As an example of how he funded these projects, John testified that for the Whitaker Road properties, he borrowed $150,000 and used some of his money from fur trapping when the loan was inadequate to cover the costs.

¶10.    The parties owned the following rental properties at the time of separation: six houses on Whitaker Road; four houses on Highway 496; four houses on Bolen Long Creek Road; six houses on Mississippi Highway 19 South;[1] nine mobile homes (Deborah testified only two are rentable.); one home on Causeyville Road; one house at 1442 Long Creek Road; one house on Old Wire Road, all in Meridian, Mississippi; one house in Grant Parish, Louisiana; an eighty-acre parcel of fox-pen land that was rented for hunting in Newton County, Mississippi; the 210-acre parcel in Lauderdale County that was leased for hunting; and the old bar. John testified that at the time of separation, about twenty of the houses were each rented at the rate of $450 per month.

¶11.    On May 11, 2010, Deborah filed for divorce based upon the ground of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. She requested

---

[1] John lost this property in foreclosure as well. At the time of separation, the six houses were rented for $450 per month. The value of the property and rentals was approximately $275,000. The parcel was used as collateral for a $99,000 loan. John failed to pay the note and lost the property to foreclosure in 2012. John testified he attempted to pay $15,000 on the balloon note the day before the foreclosure sale, but the bank refused to accept the money.

alimony and equitable distribution of the marital property. Further, Deborah filed a motion for temporary relief on various matters. John filed an answer and counterclaimed for divorce, requesting the same property and relief Deborah requested. The parties also disagreed about who would manage the rental properties and the store.

¶12.   In June 2010, an agreed temporary order granted John temporary use and possession of the marital home and the thirty-six rental properties. John was ordered to pay all expenses associated with the properties, such as taxes, insurance, and mortgages, but he would receive the rental income from the properties. The court also ordered John to pay Deborah $500 per month for temporary alimony.

¶13.   In July 2010, the chancery court entered an agreed order requiring John to pay Deborah $1,000 per month in temporary alimony and provide certain sales-tax reports, among other matters. John was allowed to continue operating the store but was required to include Deborah in any major decisions relevant to its operation. The parties were also enjoined from transferring, disposing, or encumbering any assets of the marriage unless agreed upon in writing. However, soon after the order was entered, John began mismanaging and dissipating assets. In September 2010, John closed the store without consultation or notice to Deborah, and it never reopened. Further, most of the store equipment was stolen.

¶14.   In March 2012, Deborah filed the first of six motions for contempt against John for failing to pay various court-ordered expenses, such as alimony, and failure to provide certain documents. The record indicates John was incarcerated at least twice for his failure to

comply with court orders, in 2012 and 2013.[2] The chancery court also granted Deborah use and possession of the Long Creek and Causeyville Road properties, which had formerly been granted to John. Further, in May 2014, Deborah filed a fifth motion for contempt and modification because the parties were facing a loss of additional marital property due to John's failure to pay property taxes.

¶15. After a hearing in July 2014, the chancery court found John had not responsibly managed the rental properties. Further, he never attempted to explain to the court his "irresponsible management" of these properties. Accordingly, Deborah was awarded possession of the remaining rental properties and was responsible for their indebtedness. Deborah testified when she took over the management of the properties, they were in very poor condition because John had neglected necessary maintenance. She incurred additional debt to repair them for rental. Deborah also had to pay past-due property taxes that John had failed to pay from 2011 to 2014, totaling $97,437.44. She took out several loans to do so.

¶16. Further, in May 2013, John pleaded guilty to possession of methamphetamine and receiving stolen property over $500. He was sentenced to eight years, with one year to serve, in the custody of the Mississippi Department of Corrections (MDOC).[3] In June 2016, the chancery court granted Deborah's motion to amend her complaint to add the divorce ground of John's being sentenced to the penitentiary. In May 2017, John pleaded guilty to

---

[2] In June 2012, the court found John in contempt for his failure to pay $5,000 in alimony and failure to pay various expenses, including medical bills, insurance, taxes, and mortgages, among other matters. In October 2013, the court found John in contempt for his failure to pay $10,658 in alimony, medical and vehicle expenses, taxes, and insurance.

[3] The record indicates John was incarcerated from May 2013 to February 2014.

7

another crime—possession of a firearm by a felon—and was sentenced to ten years in the MDOC's custody, with the full term suspended. Because this conviction violated his post-release supervision on the prior two convictions, however, his probation was revoked, and he returned to the State penitentiary in Parchman, Mississippi.

¶17.   In July 2018, a two-day trial commenced. John testified that in the years prior to the trial, he had been unable to earn an income, in part because he was incarcerated for contempt and then criminal convictions. His physical condition has declined due to a stroke, an impaired use of one arm, and a hernia. John testified that between June 2010 to July 2014, he spent approximately $10,000 on maintenance of the rental properties. John testified he paid property taxes on some of the parcels from 2011 to 2014. Testimony on the value of the marital and non-marital property was minimal. The parties elected to forego appraisal of their marital and non-marital property to determine fair market value. Instead, they both submitted Lauderdale County tax assessor land and improvement values. The court found the 2011 values the most reliable, with the total value of the Lauderdale County property parcels to be $1,331,290. The chancery court found the Newton County timber property value was $1,000 per acre.

¶18.   On September 19, 2018, the chancery court entered a detailed memorandum opinion and final judgment. The court granted Deborah a divorce on the ground of John's being sentenced to the penitentiary. The chancery court divided the property into marital and non-marital assets. He determined Deborah's non-marital real property to be the one-acre parcel and house on Long Creek Road, as well as 14.2 acres on Causeyville Road, which included

8

a house and the former bar, with a total value of $140,360. John's non-marital real property was his parcels of timber property in Newton County, totaling approximately twenty-two acres, with a total value of $21,700.

¶19. In dividing the marital property, the chancery court granted John the forty acres, which included the marital home, one rental house, and one mobile home; a one-acre parcel with no structures; the eighty-acre fox-pen parcel; the Louisiana house and property; a .5-acre parcel on Newell Road with no structures; and 5.1 acres of timber land. The chancery court found the value of this property was $281,120.

¶20. The chancery court granted Deborah the following marital property: the 120-acres of planted-pine land; about two-acres of sixteenth section land where the store and a mobile home is located; one acre with a double-wide trailer; .5 acre with no structures; 5.78 acres on Bolen Long Creek Road with four rental houses; 10.31 acres with three mobile homes and four rental houses; and 5.2 acres on Whitaker Road with six rental houses. The chancery court found the value of this property was $832,610.[4]

¶21. The parties were responsible for the property taxes on their awarded property. The chancery court granted Deborah the $25,323.26 deposited in the court registry from the excess of the foreclosure sale on the 210-acres of timber land. Further, Deborah was granted judgments against John for amounts he had not paid on the previous judgments of contempt.

---

[4] The disparity between the values of the marital property awarded to John and Deborah is not at issue in this appeal; John requests specific parcels of property without regard to value. Further, the chancery court did not distribute the property based on value. In its judgment, the chancery court noted that testimony of the value of the properties was minimal, and these figures were not emphasized.

Deborah's request for monthly periodic alimony and attorney's fees was denied.

## STANDARD OF REVIEW

¶22. The standard of review applied in property division and distribution in divorce cases is limited. *Bowen v. Bowen*, 982 So. 2d 385, 393 (¶32) (Miss. 2008) (citing *Owen v. Owen*, 928 So. 2d 156, 160 (¶10) (Miss. 2006)). The Mississippi Supreme Court "has repeatedly stated that the chancellor's division and distribution will be upheld if it is supported by substantial credible evidence." *Id.* at 393-94 (¶32). "The chancery court has authority, where equity demands, to order a fair division of property accumulated through the joint contributions and efforts of the parties." *Id.* at 394 (¶32) (internal quotation marks omitted). "[T]he chancellor's findings will be upheld unless those findings are clearly erroneous or an erroneous legal standard was applied." *Id.* at (¶33).

## DISCUSSION

¶23. John argues that the chancery court inequitably distributed the parties' real property and that he is entitled to the Poisso County Store, half of the parties' rental property, and the 120 acres of property located on Highway 496 in Meridian, Mississippi. Additionally, John claims he is entitled to $25,323.26 from the 210-acre foreclosure. We shall discuss each property issue in turn.

¶24. In order to divide property, the chancery court must "(1) classify the parties' assets as marital or separate, (2) value those assets, and (3) divide the marital assets equitably." *Burnham v. Burnham*, 185 So. 3d 358, 361 (¶12) (Miss. 2015) (quoting *Wheat v. Wheat*, 37 So. 3d 632, 637 (¶14) (Miss. 2010)). In order to equitably distribute property, the chancery

10

court applies the *Ferguson* factors, which include: "(1) contribution to the accumulation of property, (2) dissipation of assets, (3) the market or emotional value of assets subject to distribution, (4) the value of assets not subject to distribution, (5) the tax and economic consequences of the distribution, (6) the extent to which property division may eliminate the need for alimony, (7) the financial security needs of the parties, and (8) any other factor that in equity should be considered." *Hults v. Hults*, 11 So. 3d 1273, 1281 (¶36) (Miss. Ct. App. 2009) (citing *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994)). "[A]n equitable division of property does not always mean an equal division of property." *Bresnahan v. Bresnahan*, 818 So. 2d 1113, 1118 (¶11) (Miss. 2002). "[T]he goals of equitable distribution are a fair division of marital property based on the facts of each case and termination of the legal relationship in a manner which each party may realize self-sufficiency." *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶15) (Miss. Ct. App. 2006) (citing *Ferguson*, 639 So. 2d at 929).

¶25.    When reviewing equitable distribution, the appellate court looks to the chancery court's application of the *Ferguson* factors. *Phillips v. Phillips*, 904 So. 2d 999, 1001 (¶8) (Miss. 2004) (citing *Ferguson*, 639 So. 2d at 928). The appellate court "does not conduct a *Ferguson* analysis anew, but reviews the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *Id.*

¶26.    Here, John does not question the chancery court's classification or valuation of the property; instead, he claims it was inequitably distributed. The chancery court considered the relevant evidence related to the *Ferguson* factors, and the court found that "John and

Debbie each directly contributed economically to the accumulation of substantial marital property." In distributing the marital assets, the chancery court tried to eliminate periodic payments between the parties but found the equitable distribution would provide neither party with financial security because of the delinquent taxes and condition of the marital properties. The court also considered the loss and disposal of marital property by John and his failure to pay property taxes, among other matters.

## I. The Poisso Country Store

¶27. John contends that he should have been awarded the store for several reasons. He reimbursed Deborah $37,000 to commence its operation; provided documentation and receipts to support this contention; spent a substantial time working at the store when the parties were married; and received no proceeds from the store's profits. Further, John notes he has had no income in the past few years, is illiterate, physically impaired due to a stroke and hernia, and is in need of financial security and income. Finally, he complains that he has not been provided "any financial benefit for his hard work and dedication" in operating the store.

¶28. John disagrees with the chancery court's finding that Deborah's contribution to starting the store substantially exceeded his contribution and that John did not reimburse Deborah for her substantial store contributions. John argues he contributed approximately one-half of the cost to open the store, or $37,000, while Deborah contributed $50,000. John provided the court thirteen $500 customer receipts, checks, and withdrawal slips to support this claim. However, Deborah testified she contributed $58,000 to start the store, denied that

12

John reimbursed her, and disputed the authenticity of John's supporting documents.

¶29. The chancery court acknowledged this conflicting testimony and found Deborah's testimony more credible than John's testimony. The chancery court also found that the store was a source of substantial marital income and that Deborah was the primary manager of the store after it opened, working six days per week from 6:00 a.m. to 9:00 p.m. John trapped in the morning and then came to the store at around 1:00 p.m. He did not work at the store as much as Deborah.

¶30. John also points to the agreed order of July 2010, where he was to continue operating the store. Yet the chancery court noted that a few months later in September 2010, without consulting Deborah, John closed the store, with the parties thereby losing the $40,000 to $80,000 per month of store earnings. Further, after its closure, much of the store equipment was stolen, and it never reopened. Deborah testified it would cost over $15,000 to reopen the store.

¶31. As far as John's future financial security, it is clear the chancery court considered this factor as well as John's ability to work. The chancery court found that John had a sixth-grade education and a limited ability to read and write. The court also acknowledged John's recent physical limitations due to a stroke and hernia, as well as his prison stints, which would limit his earning capacity. However, the chancery court found John's opportunity to manage the store ended in its unilateral closure and substantially depleted the marital assets. After the chancery court thoroughly examined the evidence, he found Deborah should be awarded the store. We cannot say this decision was in error. Substantial, credible evidence

supported the decision.

## II. Rental Properties

¶32. John argues he should have been awarded one-half of the parties' rental properties because his contribution to these properties substantially exceeded Deborah's contribution. At the point of separation, the parties had thirty-six rental properties. According to the record, at the time of divorce, this number had diminished to approximately fourteen cedar rental houses, all of which were awarded to Deborah.[5] John contends he "is the sole reason why the rental properties existed and yielded income," and he made "a direct economic contribution to the acquisition of all of the properties." John points to the facts that he obtained the cedar and provided substantial labor in the construction of the cedar houses, while Deborah provided no labor. He again points to his lack of financial security and income. In the alternative, John requests possession of the ten acres on Highway 496 (with four rental houses) and five acres on Whitaker Road (with six rental houses).

¶33. The chancery court, however, took into account John's labor and economic contribution, as well as other facts. The parties borrowed money to build the houses. For the Whitaker property (six houses on five acres), John obtained a $150,000 loan and used some of his fur-trapping money to build those houses. John cut the cedar lumber for the houses. From June 2010 until July 2014, John testified he spent approximately $8,000 to $10,000 in maintenance expenses.

¶34. Despite these contributions by John, the chancery court opined John's pattern of

---

[5] The record also indicated Deborah was awarded property that had mobile homes on it, but it is unclear if these were rented.

14

mismanagement and dissipation of marital assets was highly relevant to the equitable distribution of property. Specifically, the court pointed to his failure to pay the Great Southern loan on the 3.4-acre parcel upon which six rental properties were located. This property, and the resulting rental income, were lost through foreclosure. The value of the property was $275,070. Additionally, the chancery court noted John failed to comply with the injunction prohibiting him from selling marital property by conveying the 210-acre parcel to Jonathan. John failed to honor his promise to Jonathan to pay the monthly note. This property was lost in foreclosure, with the parties losing the opportunity to plant and harvest trees on it. The chancery court found that the financial loss was "much greater" than the real property value of $36,850.

¶35.    The chancery court also noted John had not timely paid the real-property taxes since he had been awarded temporary possession of the thirty-six rental properties in the agreed order of June 2010. John failed to pay the property taxes for 2011 through 2013. Once Deborah was granted temporary possession of the rental properties in July 2014, she had to borrow funds in 2014 to pay approximately $97,437 in delinquent taxes; however, she could not pay the current taxes. After 2014, she was also responsible for the maintenance, mortgages, and insurance on the rental property. The chancery court found John had neglected to maintain the rental houses, and Deborah had to incur additional debt to repair them. She could not rent all of the houses because some were in such poor condition.

¶36.    We conclude the chancery court did not err in awarding Deborah the rental property after considering the *Ferguson* factors. Again, "equitable distribution does not mean equal

distribution." *Brabham v. Brabham*, 950 So. 2d 1098, 1100 (¶7) (Miss. Ct. App. 2007) (citing *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994)). Although John contributed to the accumulation of rental property during the marriage, once the parties separated, he dissipated it to the extent that the parties permanently lost six rental houses in foreclosure and that delinquent property taxes were still owed at the time of their divorce. Further, we are not persuaded to award John ownership and possession of the Highway 496 and Whitaker Road acreage and rental properties when substantial credible evidence supports the chancery court's decision regarding the rental properties.

### III.    The 120 Acres on Highway 496

¶37.    John argues that he should have been awarded the 120 acres of timber property on Highway 496 in Meridian. The chancery court considered this property marital. It is composed of three parcels of timber land. John claims that like most of the marital property, he invested time, labor, and money in the property to yield a profit, yet Deborah was awarded the benefit from his investment. Further, John again argues his earning capacity is well below Deborah's due to his health and that therefore he should retain the financial benefits of the property.

¶38.    Again, the chancery court considered all of the evidence and testimony presented and ultimately concluded that John's contribution in the marriage did not outweigh his dissipation of the marital estate. The record shows this property was acquired in April 2005, when Deborah was managing the country store. While John may have offered time and labor to the marital estate, Deborah's financial offerings cannot be discounted. This award

16

is supported by substantial evidence; accordingly, we cannot find the chancery court in error.

### IV.  Funds from the 210-Acre Parcel Foreclosure

¶39.    John claims he is entitled to the $25,323.26 that the chancery court awarded to Deborah, for the same reasons enumerated in the other issues.  He argues his contribution to the 210 acres substantially exceeded Deborah's contribution, and the chancery court's decision was not supported by substantial evidence.  We disagree.

¶40.    Certain facts were in dispute about the purchase and financing of the property that resulted in these excess funds.  John claims he bought the 210-parcel for $351,000 paid by a bank loan from Great Southern Bank.  Deborah testified that they paid $365,000 by a bank loan and that the down payment came from store earnings.  John testified that he paid more than $300,000 on this note through timber proceeds.  Deborah agreed that the note was paid with timber proceeds.

¶41.    Yet the property was later lost in foreclosure due to John's mismanagement.  He deeded this marital property to his son Jonathan, in violation of a court order.[6] Jonathan then used the property to obtain a $65,000 loan from BankPlus in order to pay his father's balloon note on the Whitaker property to avoid foreclosure and to pay $15,000 in alimony arrearage so John could be released from the county jail for contempt.  John agreed to pay the monthly BankPlus note, and Jonathan would convey the 210-acre parcel back to John once the note was paid off.  However, John failed to pay the note; and while Jonathan paid $23,991.04 on the note over several years, payments fell behind, and the bank foreclosed on

_____

[6] Deborah filed a civil action against John and Jonathan for his alleged violation of the court order.

the deed of trust. The bank sold the property for $25,323.26 more than the amount due on the note. John argues he is entitled to these funds, but we are not persuaded by his argument.

¶42. The chancery court acknowledged that any agreement between Deborah and John to purchase the property was disputed. John testified that Deborah did not want to invest in the property; but she claimed they both did. The chancery court recognized that John borrowed money for its purchase and also cut its timber to pay the loan off. However, the chancery court found John's testimony that he did not know about the July 2010 order's injunction unconvincing. Similarly, Jonathan claimed he did not know about the injunction until "after the fact."

¶43. In granting Deborah the funds, the chancery court found Deborah sustained a greater loss than Jonathan due to the actions of Jonathan and John. Further, John violated a court order when he conveyed the parcel to Jonathan. Finally, Deborah and John had been separated for over two years when the parcel was conveyed from John to Jonathan. Based on the foregoing, we cannot find the chancery court erred in awarding Deborah these funds and dismissing with prejudice Jonathan's request for any portion of the funds.

## CONCLUSION

¶44. After a review of the record, we find the chancery court equitably distributed the Poisso marital real property. The *Ferguson* factors were properly considered, and substantial evidence supports the chancery court's findings. Accordingly, we affirm the chancery court's judgment.

18

¶45. **AFFIRMED.**

**J. WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. CARLTON, P.J., NOT PARTICIPATING.**